## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action 20-30024 |
| | ) | |
| | ) | |
| WILLIAMS COLLEGE, | ) | **JURY TRIAL DEMANDED.** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff John Doe,[1] by and through his undersigned counsel, files this Complaint and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. This case arises from Williams College's unjust and wrongful suspension of Plaintiff, following its wrongful finding that the Plaintiff engaged in kissing and touching with another student without her affirmative consent.

2. The Plaintiff is a Hispanic male student with an excellent academic record and no disciplinary history. After he engaged in consensual sexual contact on two occasions with a fellow foreign student, she accused him of behaving in ways that were "culturally insensitive" to her conservative religious values by kissing her but then not pursuing a relationship with her. Months after the second occasion, she falsely alleged to the College that the Plaintiff had not gotten her affirmative consent to their activities on either

---

[1] A Motion to Proceed Pseudonymously is being filed herewith.

occasion—although she had sent him a message after their first encounter to tell him that "the other night was amazing" and that she had been "feeling so different and liberated after it."

3.  The College proceeded to investigate the allegations. During its investigation, it explicitly forbade John Doe from undertaking any investigation himself into the claims against him, and refused to share with him the identity or testimony of any of the witnesses identified by the complainant, although the College's policy explicitly granted him the right to suggest questions for the witnesses. At the conclusion of the investigation the College's investigator prepared a report which detailed the results of interviews she conducted and attached documents she had gathered, but did not reflect on the demeanor or credibility of either party or of the witnesses, or provide any analysis of the case. The Plaintiff's guilt or innocence was then determined by a hearing panel, based solely on the contents of that report. The Plaintiff had no opportunity to appear before that panel. The panel did not interview or hear directly from either the complainant or the respondent (the Plaintiff) or from any of the witnesses. The panel found the Plaintiff responsible for kissing and touching the complainant without her affirmative consent in the second incident solely based on the written record.

4.  In reaching that decision, the panel ignored numerous inconsistencies in the complainant's claims, misrepresented and misquoted statements by both parties, and misapplied both the College's policy and the preponderance of the evidence standard that the policy required the panel to apply. Ultimately, it concluded that John Doe "may not have intended to engage in nonconsensual sexual conduct" but still found him responsible

for non-consensual sexual conduct and suspended him from Williams College for one semester. The College then denied his subsequent appeal.

5. Plaintiff has suffered and will continue to suffer serious damages as a result of Williams' actions, including but not limited to the loss of opportunities during the semester that he was suspended, loss of future educational opportunities, the loss of job opportunities, reputational harm, and emotional distress.

## JURISDICTION AND VENUE

6. This action arises out of the College's breach of its contractual and other obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681).

7. The plaintiff is an out of state resident, who is in Massachusetts only temporarily for College, and the defendant is a citizen of Massachusetts.

8. The amount in controversy is over $75,000.

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

10. Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

11. The Plaintiff, identified here as "John Doe" or "Plaintiff," was a full-time student at Williams College in 2016 and 2017. The Plaintiff had a very strong academic record in high school and achieved a high standard of academic achievement and campus leadership at Williams.

12. Williams College is a partly federally-funded, private liberal arts college located in

Williamstown, Massachusetts, with approximately 2000 enrolled undergraduate students.


## FACTS

Plaintiff's Interactions with Complainant "Sally Smith"

13. On November 19, 2016, John Doe had dinner and went for a walk with another Williams

student, "Sally Smith." Smith had previously told a number of her friends that she was

interested in Doe. During their discussion while walking, Smith told Doe that due to

restrictive cultural norms in her home country, she had never kissed a boy.

14. After their walk, Doe and Smith returned, at Smith's insistence, to Doe's dorm room to

continue to spend time together. Before Smith left, Doe asked if he could kiss her.

15. Smith responded that he could, and the two kissed. Doe and Smith also engaged in

consensual touching, while both remaining fully clothed.

16. Smith consented, specifically and verbally, to all of the kissing and touching that took

place.

17. Two days later, on November 21, 2016, Smith sent Doe a message asking to talk to him.

Doe responded that he couldn't that night, and suggested that they speak the next

morning. Smith responded that she was leaving for break the next day, and suggested that

they speak after the break. Four hours later, Smith sent Doe a message reading:

> [John], I think I can't wait till the break to end. So I will just let my
> thoughts out here. The other night was amazing. Although I value the
> emotional aspects over the physical ones, I've been feeling so different
> and liberated after it. I've not been this happy ever since I started college. I
> just want to apologize for being so weird and awkward the entire time. It
> was because I've liked you quite a lot since the [redacted] days and even
> most of my friends know about it. That's probably why I couldn't handle

all this quite well. I would be glad to get to know you more if you still wanna know me better.

18. John Doe did not respond to that message for four days. He then sent three messages back, reading, "hey I didn't see this sorry" "let's hang out at some point next week" and "I'm just going to be super busy until the end of the semester . . ."

19. In January 2017, Smith applied for a position with a student organization in which Doe held a leadership role. Prior to Smith's interview for the role, she messaged Doe to ask to speak. They arranged to have a conversation on the evening of January 11, 2017, in Doe's room. By that time, Smith had already interviewed and the decision to select her had already been made, which Doe communicated to Smith. When Doe and Smith met at his room that night, she expressed anger about what she saw as Doe's cultural insensitivity around their prior interaction.

20. Doe understood that Smith was upset that he had kissed her but then not followed through on her expectations of a romantic relationship. Doe explained to Smith that he was not emotionally available and did not want her to wait in the hope of a relationship. The two then had a friendly conversation about other topics.

21. Before Smith left his room, Doe asked if he could kiss her, and she responded that he could. Doe and Smith did not have sex or remove their clothes, but engaged in consensual kissing and touching above the waist. Doe asked Smith before initiating any new touching and did nothing without her consent.

22. At one point, Doe asked to touch Smith's breasts under her shirt and she said no. Doe therefore did not touch Smith's breast at that point, and they continued to kiss. Several minutes later, Doe asked again if he could touch Smith's breasts under her shirt, and she

responded at that time that he could. At that point, with her permission, Doe did touch her breasts.

23. On January 17, 2017, Doe asked Smith to speak with him because he had noticed that her friends were treating him strangely. During their conversation, Smith accused him of "emotionally manipulat[ing]" her and of "tak[ing] advantage of [her] lack of knowledge of American cultural norms" and of "disrespect[ing]" her own cultural norms. Smith also informed Doe that she had lots of people ready to hurt him.

24. Doe turned to Williams College administrators seeking help to resolve his conflict with Smith. He spoke first with Dean Ninah Pretto, who informed him that Smith's statement that she had people ready to hurt Doe could be grounds for a complaint of harassment. Dean Pretto referred him to Meg Bossong, Director of Sexual Assault Prevention and Response, telling him that Ms. Bossong was a confidential resource. Doe wrote Ms. Bossong a lengthy email describing what had happened between him and Smith, but she responded that she was unable to assist him. Everyone that Doe went to for help at Williams told him that they were unable to help.

25. Shortly after hearing from Doe, Ms. Bossong spoke to Smith's Junior Advisor ("JA") ("Witness A")[2], who reached out to her on Smith's behalf. (JAs are Williams Juniors who volunteer to live with first-year students and help them acclimate to college life.).

26. On or about April 10, 2017, Smith made a Title IX complaint against Doe, falsely accusing him of sexual misconduct in both their November and January interactions.

---

[2] The identities of the witnesses are known to the parties but including them in the Complaint might permit identification of Doe and/or Smith.

The College's Investigative Process

27. During the 2016-2017 school year, the Williams College Investigation and Adjudication Process for Sexual Assault, Sexual Exploitation, Stalking, Relationship Abuse, attached hereto as Exhibit A and incorporated by reference herein (the "Process"), governed the College's investigation and adjudication of all allegations of sexual assault against Williams Students.

28. The College's Process was contained in the student handbook and was also promulgated to students via the College's website. In addition, Williams College provided Doe with a copy of the College's Process when it notified him of the complaint against him.

29. The Process stated that the Dean of the College will assign a trained investigator "to determine the facts of the case as completely as possible." The investigator's tasks, as set forth in the Process, included interviewing the complainant and respondent and witnesses, and collecting any additional evidence available.

30. The Process specified that "[t]he complainant and respondent may each suggest questions to the investigator to be asked of others."

31. Following the investigation, the Process required the investigator to produce a report of his or her findings, including a list of those interviewed and copies of any additional material referenced.

32. Under the Process, the Dean of the College was required to "ensure that the report does not contain material that is inadmissible in the decision process."

33. The investigator was not required or permitted to make findings of fact or credibility determinations; the investigator's report was to simply recount the statements of the parties and witnesses and attach any relevant documentary evidence.

34. The investigator's report was shared with the complainant and respondent, who were each permitted to write a response to it.

35. The report, and any responses, were then shared with a hearing panel of three Williams staff members.

36. Neither the complainant nor the respondent was permitted to appear before the hearing panel.

37. The hearing panel would not hear in person from any of the witnesses in the case and made its decision based purely on a written record.

38. The Process provided that the panel "will decide whether there is a preponderance of evidence showing a violation of the college's code of conduct as regards sexual misconduct."

39. The Williams College Code of Conduct ("Code of Conduct") defined various disciplinary offenses as sexual misconduct, including "non-consensual sexual contact," which it defined as any sexual touching without effective consent. Other instances of sexual misconduct in the Code were "non-consensual sexual intercourse" and "sexual exploitation."

40. The Code of Conduct defined consent to mean "that at the time of the sexual contact, words and conduct indicate freely given approval or agreement, without coercion, by all participants in the sexual contact."

41. The Code of Conduct further provided that individuals are unable to give consent if "substantially physically or mentally impaired by illness, alcohol or drugs;" "forced, coerced, threatened or subject to intimidation;" or "physically incapable of communicating, asleep, or unconscious." It also stated that consent could be withdrawn.

Application of the College's Investigative Process to John Doe's Case

42. In a letter dated April 10, 2017, Williams College Dean Marlene Sandstrom informed John Doe that "a complaint has been made regarding possible sexual misconduct in your interactions with [Sally Smith]. Specifically, the concern regards the question of whether there was a non-consensual sexual interaction with [Sally] in November 2016 and January 2017."

43. The letter gave no additional detail about the nature of the sexual interactions that Smith was claiming had taken place, including whether they allegedly included intercourse or sexual exploitation, when or where they took place, or whether Smith was alleging that she was incapable of consenting for one of the reasons enumerated in the policy, and did not attach any written complaint. A copy of the full Code of Conduct was attached to the April 10, 2017 letter, but the letter did not specify which provisions of the code Doe was accused of violating.

44. Dean Sandstrom informed Doe in her April 10, 2017 letter that she had appointed attorney Allyson Kurker of Kurker Paget LLP to act as the investigator in Doe's case.

45. Williams College did not give Doe any additional information about the allegations against him before he had to appear for his interview with Ms. Kurker. As a result, he had to prepare for his interview without knowing what type of sexual interaction the

complainant alleged had occurred between them or the basis for her claim that the interactions were non-consensual.

46. The April 10, 2017 letter stated that, "Confidentiality is crucial to the integrity of this process. It is very important not to talk with other students about it. This restriction includes other students who you feel may have information about the case." It added that breaches of confidentiality would result in an additional disciplinary process.

47. In Doe's first interview with Ms. Kurker on April 27, 2017, she offered Doe the opportunity to identify possible witnesses and gave him a deadline to do so. She informed him that she was interested in only witnesses who had witnessed events directly or discussed the events at issue directly either with John or with Sally Smith.

48. On May 3, 2017, John Doe emailed Dean Sandstrom to ask if he was allowed "to speak to other people who may or may not have useful information in order to try to identify additional witnesses." His goals were to speak with friends to ask whether he had spoken to any of them at the time of his interactions with Smith about what happened between them, and to speak to mutual friends to learn whether Smith had spoken to them. Dean Sandstrom responded that he was not permitted to speak to any potential witnesses.

49. Both Doe and Smith identified possible witnesses to Ms. Kurker. Because Williams barred him from undertaking any investigation of his own to determine what witnesses he might have spoken to about his interactions with Smith when they took place, Doe was able to identify only four witnesses.

50. Ms. Kurker never offered Doe the opportunity to submit questions for the witnesses, although the College's Process stated that he was entitled to suggest questions.

51. Doe was not permitted to be present for the interviews of the complainant or any witnesses. Ms. Kurker gave Doe only limited information about the complainant's statements.

52. Ms. Kurker interviewed a total of eight witnesses in addition to Smith and Doe. Of those witnesses, five were identified only by Smith and one was identified by both Smith and Doe. Two were identified only by Doe.

53. Doe identified one additional witness, who declined to be interviewed when Ms. Kurker reached out to her. Because Dean Sandstrom had forbidden him to contact witnesses, Doe was unable to inform the witness that he had identified her or ask her to speak to the investigator. On information and belief, if Doe had been able to ask the witness to speak to the investigator, she would have done so and it would have benefitted his case.

54. Ms. Kurker interviewed Smith on April 20, 2017; May 12, 2017; and June 11, 2017 (by email).

55. Ms. Kurker interviewed Doe on April 27, 2017, May 19, 2017, June 15, 2017, and June 22, 2017.

56. During one of Doe's follow-up interviews with Ms. Kurker, on June 15, 2017, Ms. Kurker reported to Doe what the three witnesses that he had identified had told her in their interviews, and gave him a chance to respond to their statements.

57. Doe asked Ms. Kurker in that interview for information about what the witnesses Smith had identified had said in their interviews. Ms. Kurker responded that she would not share any information with him about the complainant's witnesses. Accordingly, the College completely deprived Doe, for the entirety of Ms. Kurker's investigation, of all

information regarding the identities of five of the eight witnesses interviewed, the substance of their statements, and the topics about which they were interviewed.

58. Because Williams College deprived him of information about the complainant's witnesses and the topics on which they provided information, Doe was unable to suggest questions for any of the complainant's witnesses during the investigation, although the Process stated that he would be allowed to propose questions for all witnesses.

Draft and Final Investigation Reports

59. On July 5, 2017, Dean Sandstrom provided Doe with a copy of Ms. Kurker's "Report of investigation involving [Sally Smith] and [John Doe]" (the "draft report"). Included with the Report were 17 exhibits, consisting of documents that Ms. Kurker had gathered during her investigation.

60. John learned for the first time when he received the draft report that the complainant was alleging that he had not only kissed and touched her after she said no, but that he had used force and that she suffered bruises as a result of their encounter. All of these allegations were false.

61. The draft report excluded many significant facts that John had shared with the investigator. In his response to the report, John included those facts so that they would be presented in some form to the hearing panel. However, the exclusion of those facts from the report suggests that similarly important facts might have been left out regarding statements by Smith or her witnesses. John was completely dependent on the investigator and the report for his knowledge of their statements and unable to remedy any exclusion from the report.

62. On July 15, 2017, Doe provided Dean Sandstrom with his response to the draft report.

63. In that draft response, Doe relied on texts between one of the witnesses ("Witness B") and Doe's then-girlfriend, who was not interviewed in the investigation. In those texts, Witness B described in some detail her conversations with the complainant, Sally Smith, and with Witness A, Smith's JA, who had spoken to Witness B several times on behalf of Smith about Smith's conflict with Doe.  Witness B recounted in those messages that Smith told her that she did not want to "get the deans on this" because she "still loved" Doe.  Witness B also noted that Witness A was pushing Smith to call her interactions with Doe sexual assault.

64. After receiving Doe's draft response, Dean Sandstrom informed him that because those messages did not "describe direct knowledge of the incident in question," they were being removed from the report and Doe was required to remove all reference to them from his response. Dean Sandstrom agreed that the report itself could contain some of the information that Doe wished to rely upon from the messages but would not allow the messages themselves to be an exhibit.

65. Doe then requested that a number of other exhibits, which were prejudicial to him, be removed as exhibits. Those documents, like the messages between Witness A and Doe's girlfriend, also did not describe direct knowledge of the incident.

66. Among the exhibits that Doe asked to have removed was a series of texts between a witness ("Witness C") and her boyfriend in which she, like Witness B, described her interactions with the complainant after the January incident and recounted the complainant's claims.

67. Another exhibit that Doe asked to have removed was a document which Witness A, the complainant's JA who had pushed her to call her interactions with Doe "sexual assault," prepared specifically as a piece of advocacy on behalf of the complainant, at least partly while the investigation was going on rather than contemporaneously with the events that it described. In that document, Witness A described Smith as a "very strong woman," described Doe as a "smooth talker," and reflected generally on events, including stating that Smith's description of her November interactions with Doe "sent up red flags" for her.

68. Dean Sandstrom denied Doe's request to remove any additional exhibits, although those exhibits were irrelevant according to the logic that she relied upon to remove Witness B's texts.

69. According to the draft report, a number of Sally Smith's friends told the investigator that Smith was motivated to report Doe to the school because she was angered by his receipt of a particular honor at the College. Smith herself denied that Doe's receipt of this honor was her motive for reporting. Dean Sandstrom instructed the investigator to remove all references to the honor from the final report.

70. Doe argued, in an email to Dean Sandstrom on July 27, 2017, that the references to the honor should remain because the difference between Smith's statements to the investigator and her contemporaneous statements to her friends reflected on her credibility. Dean Sandstrom refused to include the references, saying that Smith's explanation for the discrepancy "contains additional information that could be prejudicial to you." When Doe asked what Smith's explanation was, Dean Sandstrom refused to share that information with Doe or allow him to rebut it.

71. In his initial response to the report, Doe noted that during their November date, Smith had spoken to him about feeling that one of her professors was culturally insensitive to her. He also noted that during their interactions in January 2017 Smith told him that she felt that a Williams freshman had sexually harassed her. Dean Pretto required Doe to remove all references to Smith's accusations against the freshman from his response to the report. Doe objected to this requirement, on the grounds that Smith's repeated accusations of cultural insensitivity were relevant to her claims against him, but was forced to remove the information from his response.

72. In the course of these discussions, Dean Sandstrom provided Doe with a second draft report on July 25, 2017, and a final investigation report, prepared in accord with Dean Sandstrom's specifications (the "final report"), on July 29, 2017.

73. Doe submitted his final response to the final report, edited to remove information per Dean Sandstrom's requirements, on August 1, 2017.

74. Sally Smith's final response to the final report relied heavily on the notes that Witness A, her JA, had provided as an exhibit. She stated that the panel should refer to her three interviews and those notes "to precisely understand my truth." Although the investigator, Ms. Kurker, was the only representative of Williams who spoke directly to Doe or Smith or any witness about their versions of events, the final report did not contain any information about the parties' demeanor during their interviews, about their motives to make false statements, or about the consistency (or lack thereof) between their accounts and their prior statements. In short, the report contained no reflections that could assist the hearing panel, which would never meet either party, to evaluate their credibility.

75. Dean Sandstrom has a close relationship to a family member of Doe's.  On information and belief, Dean Sandstrom was motivated to make harsh decisions regarding Doe's case in order to shield herself from accusations of favoritism.

Training Provided to Panelists

76. On information and belief, panelists received training on the Code of Conduct regarding sexual misconduct prior to sitting on a panel.

77. On information and belief, the training materials given to panelists, including those who decided John Doe's case, were substantially those attached as Exhibit B.

78. These training materials contain anti-male bias and encourage panelists to stereotype men as sexually aggressive and more likely to commit sexual assault.

79. For instance, the materials state that "Sexual Aggression" is created by the confluence of "Impersonal Sex" and "Toxic Masculinity," and that the "Hostile Masculinity Pathway" incorporates a "hostile-distrustful orientation, especially towards women" by those who receive "[g]ratification from controlling or dominating women."

80. The training materials also state, "Offenders are intentional in their behavior," and indicate that such "Offenders" tend to "mistrust women's communications and to perceive them as hostile."

81. The training materials state that the code does not weigh in on the intent of the "perpetrator," suggesting that panel members can find a respondent guilty of sexual misconduct without considering his intent. The Code of Conduct communicated to students does not contain any similar provision regarding intent.

82. The training materials include claims about "traumatic memory" suggesting that panel members should ignore inconsistencies in complainants' accounts.

83. The training materials do not focus on the possibility that men could be victims of sexual misconduct or discuss behaviors by women that could create risks of sexual aggression.

Decision by the Williams College Hearing Panel

84. A hearing panel composed of Williams staff selected by Dean Sandstrom met to consider Doe's case on August 15, 2017.

85. Neither Doe nor Smith was either required or permitted to attend the panel's meeting. The panel did not hear directly from any of the witnesses interviewed during the investigation, and its decision was based entirely on its review of the final report and of the parties' statements.

86. The hearing panel's decision was communicated to Doe via a letter dated August 23, 2017, on the letterhead of the Office of the Dean.

87. That letter explained that the panel had found Doe responsible for non-consensual sexual contact with Sally Smith with regard to the January incident, though not with regard to the November incident.

88. In finding Doe responsible for non-consensual sexual contact with regard to the January incident, the panel relied on three pieces of evidence.

89. First, the panel gave weight to its conclusion that, after the fact, Smith came to view the November incident as non-consensual.

90. In particular, the panel concluded that Smith had "indicate[d] discomfort afterwards," following the November incident, because the text message that she sent on November 21, 2016 stated that she "valued the emotional aspects of the relationship over the physical ones."

91. The panel at no point noted or gave weight to the fact that in the same text message Smith described her November interaction with Doe as "amazing" and told him that she had "been feeling so different and liberated after it" and had "not been this happy ever since I started college."

92. The other pieces of evidence that the panel relied on to conclude that Smith had come to view the November interaction as non-consensual were witness statements, none of which indicated that Smith had communicated that view to Doe.

93. Second, the panel relied on an email that Doe wrote to Meg Bossong, the College's Director of Sexual Assault Prevention and Response, to conclude that Smith told Doe on January 11 that she felt that he had mistreated her on the prior occasion.

94. The panel's reading of Doe's email to Ms. Bossong misrepresented the evidence in the record; in fact, the email in question made clear Doe's understanding that when Smith confronted him on January 11 she felt that he had mistreated her by not moving forward with a relationship after kissing her, not that she felt he had done anything without her consent.

95. Third, the panel concluded that based on Doe's account, Smith had "expressed a clear 'no'" at various points during their January 11 encounter. As described in paragraph 22, *supra*, Doe explained that in the instances when Smith told him "no" during their interaction in response to his questions about whether he could touch her in specific ways, he respected her "no" and did not do anything she had not consented to. Later in their encounter, he asked again if he could engage in activity to which she had previously said no, and at that point she said yes.

96. Nothing in the Williams College Code of Conduct forbids a student from asking more than once if their partner wants to engage in a sexual activity so long as both parties consent to the activity "at the time of the sexual contact."

97. The panel's letter to Doe stated, "While we acknowledge that you may not have intended to engage in nonconsensual sexual contact, we find a preponderance of evidence that you did, in fact, do so."

98. The panel clearly did not credit Smith's assertion that Doe engaged in forcible sexual contact over her verbal objections. Instead, it essentially held that he should have guessed that she would not want to engage in kissing or touching under the circumstances.

99. The panel took no note of evidence in the report that Smith had repeatedly lied to her friends about her interactions with Doe and had attempted to mislead the investigator. This evidence included:

    a. In her first interview with the investigator, Smith made a very specific claim that in November Doe had been in a leadership role over her in a student organization that they were part of and that, because of that relationship, she didn't know how to tell Doe that she was uncomfortable during their November date. In fact, Doe did not hold that role over her and they had no relationship within that organization in November.

    b. Smith told the investigator in their first interview that following their November date she messaged Doe and "told [him] that she was not interested in a physical relationship," and requested an "explanation" for what he did. In fact, she messaged him as quoted in full in paragraph 17, *supra*, and did not say that she

was not interested in a physical relationship or seek an explanation. Smith did not provide her actual messages to the investigator.

c. Smith told several of the friends that she identified as witnesses that nothing physical had happened between her and Doe during their November interaction.

d. Following the November interaction, Smith told some of her friends that she had messaged Doe to tell him that what happened was "not okay." Again, the actual message is quoted in full in paragraph 17, *supra*, and does not express that emotion.

e. Before the January interaction, Smith told a friend that Doe had requested to meet so that he could apologize to her. This was false.

f. Before the January interaction, Smith told some of her friends that Doe was requiring her to go to his room to meet. This was false.

g. Smith's description to her friends of her physical interactions with Doe during their January interaction differed in key details from the description that she offered to the investigator.

100. The panel's conclusion that a preponderance of the evidence supported a finding that Doe had engaged in nonconsensual sexual contact was arbitrary, capricious, and irrational and was based on a biased and dishonest reading of the evidence before the panel.

<u>Sanction and Appeal</u>

101.    Pursuant to the College's Process, after the finding of responsibility, John Doe

was given the opportunity to briefly address the hearing panel regarding the sanction for

his conduct.

102.    As set forth in the hearing panel's August 23, 2017 letter, Doe was not permitted,

when appearing before the panel, to discuss the facts of the case or to introduce new

evidence; instead, he was permitted to "present directly to the committee in [his] own

'voice' any additional information pertinent to determining the sanction."

103.    The panel met to determine the sanction on August 30, 2017.

104.    Doe appeared before the panel and read a brief statement. Per the instructions

from the panel, he did not discuss the facts of the case.

105.    On September 1, 2017, Dean Sandstrom notified Doe by letter that the panel had

chosen to suspend him for one semester.

106.    Under the College's Process, Doe had the opportunity to submit an appeal on the

grounds of significant procedural lapses or the appearance of substantive new evidence

not available at the time of the original decision.

107.    Doe submitted his appeal to Leticia Haynes, the Vice President for Institutional

Diversity and Equity, on November 15, 2017.

108.    As grounds for appeal, Doe pointed to procedural errors including the

investigator's refusal to share information about the complainant's witnesses and his

inability to present questions for the witnesses; the College's refusal to permit him to

investigate the allegations or gather relevant information for his defense; Dean

Sandstrom's decisions with regard to what information could be included in the final

report, which resulted in the inconsistent removal of relevant information and the inclusion of irrelevant and prejudicial documents; Dean Sandstrom's decision to deny him information about claims that Smith made related to her choice to report Doe to the College; and Dean Sandstrom's failure to recuse herself from the case in view of her relationship to Doe's family member. Doe also argued on appeal that the hearing panel's decision was not supported by a preponderance of the evidence.

109.     On October 9, 2017, Ms. Haynes denied Doe's appeal.

110.     John Doe's permanent educational record will reflect the hearing panel's finding that he was responsible for non-consensual sexual touching. In applying for almost any form of post-graduate education, Doe will have to answer application questions regarding his disciplinary history, which will require him to respond that he was found responsible for non-consensual sexual contact.

111.     The mark on Doe's educational record stigmatizes him as a sexual offender and will be a serious barrier to his continuing his education after receiving his degree from Williams College.

112.     Doe's career plan—to attend law school and pursue a career in politics—will be closed to him if his permanent education record includes a finding that he engaged in non-consensual sexual conduct. Doe's unearned disciplinary history at Williams College will be a lifetime liability.

113.     On information and belief, Smith asked Witness A, her JA, to tell people on campus, including Doe's friends, of her allegations.

114.     On information and belief, Smith, Witness A, and other friends of Smith have widely spread Smith's version of events on campus.

115.     As a result of Smith's and the College's conduct, Doe was shunned or castigated by many of his fellow students and feared for his safety on campus.

116.     Following completion of Doe's suspension, Smith circulated information on campus falsely asserting that he had claimed to be "liberating" her during their sexual interactions, and complaining that although he was found guilty, he was still allowed to return to the school. While she did not specifically name Doe, others on campus recognized the false information as referencing him.

117.     Doe complained to Dean Sandstrom about Smith's sharing of this false information.  He also met with Title IX Coordinator Toya Camacho, who referenced the "#MeToo" movement and spoke about the importance of women speaking out about their experiences, as reasons for the College not to take action. The College took no action.

118.     Following completion of his suspension John was selected, through a competitive process, for a leadership position on campus. Shortly thereafter, he was told that others in the organization had learned of his disciplinary history and that he had to resign from the position or would be removed from it. The position would have significantly bolstered his resume.

119.     Doe had worked hard on starting a student organization on campus but was asked to leave it as a result of the outcome of the disciplinary process in this case. Again, his involvement with the organization would have bolstered his resume.

120.     Another student who had served as a witness for Doe during the disciplinary process was also stigmatized on campus and forced to leave a student organization.

121.     Doe sought to spend his final semester of college at another institution, in order to avoid the stigma and social isolation that he experienced at Williams following his

suspension. He applied to three schools, all of which routinely accept Williams students for temporary study, and was rejected by all of them. In light of Doe's other academic credentials, these rejections were clearly the result of his disciplinary history.

122.    Doe's suspension has resulted in the loss of significant academic honors and opportunities.


Count I

Breach of Contract


123.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

124.    John Doe had a contract with the College, pursuant to which he was entitled to receive a four-year undergraduate education and a degree provided he met all the requirements for graduation, including those imposed under the Code of Conduct.

125.    With respect to disciplinary matters, John Doe and Williams had mutual expectations, and the contract required, that the College would follow its own rules, provide a fair and reliable fact-finding procedure, and not act arbitrarily or capriciously.

126.    The Process explicitly stated that the College would provide a "prompt, fair, and impartial investigation and resolution" of all complaints of sexual misconduct.

127.    As a private institution, Williams College had a duty to provide accused students with a minimum level of basic fairness in the procedures it used to adjudicate sexual misconduct complaints.

128.    The Process gave John Doe the right to propose questions to be asked of witnesses.

129.     The Process required the hearing panel to impartially apply the preponderance of

the evidence standard to the question of whether he had the complainant's consent to

their activities at the time that they happened.

130.     The Process required the Dean of the College to direct removal of irrelevant

information from the final report before it was provided to the hearing panel but did not

permit the Dean to remove relevant information.

131.     Because the College suspended Doe without ever allowing a fact-finder (the

hearing panel) to judge the credibility of Smith or other witnesses face to face, the

Process violated the College's obligation of basic fairness.

132.     Williams breached its contract with Plaintiff by instituting and prosecuting an

investigation and adjudication in violation of its policies and procedures and without

affording him basic fairness.

133.     As a direct and proximate result of that breach, Plaintiff suffered the harms

described above.

Count II

Breach of Covenant of Good Faith and Fair Dealing

134.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

135.     Every contract contains within it an implied covenant of good faith and fair

dealing.

136.     Williams breached that covenant by depriving Plaintiff of basic fairness and by

pursuing its investigation and adjudication in an unfair and biased manner.

137.     As a direct and proximate result of that breach, Plaintiff suffered the harms described above.

Count III

Title IX (20 U.S.C. § 1681)

138.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

139.     Williams erroneously and wrongfully disciplined plaintiff for sexual assault based on a flawed disciplinary process.

140.     Gender bias was a motivating factor in Williams's decision.

141.     Specifically, the training materials supplied to panelists encouraged them to find men responsible and to stereotype men as aggressors and women as victims.

142.     The panel's decision in this case showed the effect of those materials in its biased approach to evaluating the facts in this case.

143.     In addition, Dean Sandstrom included and excluded evidence from the panel's consideration in a manner that showed bias in favor of Smith and against Plaintiff.

144.     Because Plaintiff brought these issues to the attention of top administrators at the College, including Dean Sandstrom and Vice President Haynes, and the College took no action to remediate the biased and unfair process, the College displayed deliberate indifference to Plaintiff's rights.

145.     As a direct and proximate result of Williams's erroneous finding, Plaintiff suffered the harms described above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against defendant on all counts of this complaint. Plaintiff further requests that this Court:

1. Order defendant to reverse its finding that plaintiff violated its policies, and expunge his record;

2. Award plaintiff compensatory and punitive damages in an amount to be determined at trial;

3. Award plaintiff the reasonable costs of this action, including attorneys' fees;

4. Grant such other and further relief as this court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,
John Doe
By his attorneys,


/s/David A. Russcol
Ruth O'Meara-Costello (BBO# 667566)
David A. Russcol (BBO# 670768)
Zalkind Duncan & Bernstein LLP
65A Atlantic Ave.
Boston, MA 02110
617-742-6020
rcostello@zalkindlaw.com
drusscol@zalkindlaw.com

Dated: February 18, 2020