## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,             ) | |
|         ) | |
|     Plaintiff,    ) | |
|         ) | |
| v.               ) |    Civil Action 20-30024-KAR |
|         ) | |
|         ) | |
| WILLIAMS COLLEGE,   ) | |
|         ) | |
|     Defendant.  ) | |
|         ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction and Factual Summary

Defendant Williams College suspended the Plaintiff, John Doe, for alleged sexual misconduct, leaving him with a black mark on his record that will permanently affect his future education and employment. In investigating and adjudicating Sally Smith's allegations against the Plaintiff, Williams did not comply with its own policies, denied him basic fairness, and discriminated against him on the basis of his sex.

From the beginning of the case, Williams, acting through Dean of the College Marlene Sandstrom, gave the Plaintiff only limited information about the allegations against him. (PF ¶ 12.)[1] It specifically barred him from undertaking any investigation into the allegations against him; from asking witnesses to participate in the process on his behalf; and from confronting his accuser or her witnesses in any form. (*Id.* ¶¶ 13, 16.) It failed to follow up with a witness he identified, telling him falsely that she declined to participate. (*Id.* ¶¶ 44-45.) The College's investigator,

---

[1] Citations to Plaintiff's Statement of Additional Material Facts are in the format "PF." Citations to Defendant's Statement of Material Facts are in the format "DF," and citations to Plaintiff's responses to Defendant's Statement of Material Facts are in the format "PR."

Allyson Kurker, refused to share even identities of many witnesses, so he could not propose questions for them during the investigation (as Williams' policies gave him the right to do). (*Id.* ¶ 46.)

Williams trained decisionmakers in the Plaintiff's case using materials that encouraged them to view male students as sexual predators. (*Id.* ¶¶ 81-92.) One decisionmaker told the Plaintiff, following his suspension, that "the MeToo movement" affected her ability to respond to retaliation by his accuser, and suggested that the importance of women speaking out about their experiences outweighed Doe's interest in confidentiality. (*Id.* ¶ 128.)

Most significantly, the panel that found the Plaintiff responsible for sexual misconduct never met, saw, or heard from Doe, his accuser Sally Smith, or any of the witnesses before making that decision. It did not ask them questions, or examine their demeanor. It did not even have transcripts of their interviews. It had only the investigator's summary of witness interviews, and the parties' written responses to her report. (PF ¶¶ 99-103.) These materials omitted, over Doe's objection, information relevant to evaluating Smith's credibility. (*Id.* ¶¶ 60-66.) Particularly in a case where credibility was a key issue because only the two parties were present and they disagreed about what happened, these materials were insufficient to allow the panel to reach a fair decision.

Doe appealed the decision. (*Id.* ¶¶ 119-20.) The Dean of the College, a primary decision-maker in many aspects of the process to which he objected, secretly submitted an unsolicited rebuttal to the appellate officer designated in the Process. (*Id.* ¶¶ 121-23.) Doe did not know of this document and had no opportunity to respond to it. (*Id.* ¶ 123.) The appellate decision relied heavily on the Dean's rebuttal. (*Id.* ¶¶ 124-26.) Doe's appeal was denied. (*Id.* ¶ 124.)

### Argument

The Plaintiff's claims should be decided by a jury. Summary judgment is only proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (hereinafter *Boston College I*) (quoting Fed. R. Civ. P. 56(a)). All reasonable factual inferences must be drawn in favor of Doe as the non-moving party. *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 65 (1st Cir. 2019). Courts must be particularly wary of granting summary judgment on discrimination claims because "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury." *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000) (quoting *Mulero–Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir.1996)).

## I.     The College's actions violated its contract with the Plaintiff.

In Massachusetts, a university's handbooks, policies, and codes of conduct form a contract with its students. *See Helfman v. Northeastern Univ.*, 149 N.E.3d 758, 776, 485 Mass. 308, 327 (2020). Courts must apply the "reasonable expectations standard" in interpreting the terms of the contract by ascertaining "what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it." *Boston College I*, 892 F.3d at 80 (quoting *Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57, 61 (1st Cir. 2016)) (alterations in original). When disciplinary proceedings are involved, the court "review[s] the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules." *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983). The university has breached its contract if it "failed to meet [Doe's] reasonable expectations." *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378, 432 Mass. 474, 478 (2000); *see Boston College I* at 80.

A university also has an independent obligation to ensure that the disciplinary process was "conducted with basic fairness." *Schaer*, 432 Mass. at 481 (quoting *Cloud*, 720 F.2d at 725). This requirement derives from the implied covenant of good faith and fair dealing, unless a university "expressly promises no less than basic fairness," in which case issues under the contract and the

implied covenant merge. *See Boston College I* at 87-88.[2] A university may not rely merely upon compliance with its policies to resolve a question of basic fairness. *See Doe v. Trs. of Boston Coll.*, 942 F.3d 527, 533, 535 (1st Cir. 2019) (hereinafter *Boston College II*).

In addition, Williams was required either under its contact or as a matter of basic fairness to comply with all applicable laws relating to the disciplinary process. Williams promised in its Code of Conduct only to sanction students "consistent with local, state, and federal law." (PF ¶ 22.) A university also cannot be said to provide basic fairness to its students while violating established law. Williams failed in several respects to comply with then-applicable federal regulations under the Clery Act, 34 C.F.R. § 668.46(k), which became effective July 1, 2015, and required the College to provide "a prompt, fair, and impartial process from the initial investigation to the final result," 34 C.F.R. § 668.46(k)(2)(i), and conduct its proceedings in a manner that is "consistent with the institution's policies and transparent to the accuser and accused." 34 C.F.R. § 668.46(k)(3)(i)(B)(1). Williams' failure to comply with these and with other regulatory directives discussed *infra* breached its contract and requirements of basic fairness.

**A. Williams did not follow the terms of its contract with the Plaintiff as a reasonable student would have understood them.**

**1. Williams did not give the Plaintiff notice of the applicable policy before his interactions with the complainant took place.**

Before Doe and Smith's first date in November 2016, the College directed students in email

---

[2] In this case, the Williams Code of Conduct stated, "The College's procedures seek to ensure a prompt, fair, and impartial investigation and resolution." (PF ¶ 31.) This statement is similar to language in Boston College's Student Guide that the First Circuit held to be an explicit promise of basic fairness: "[the disciplinary process] exists to protect the rights of the Boston College community and assure fundamental fairness to complainants and to students accused of any breach of the University Code of Student Conduct." *Boston College I*, 892 F.3d at 87-88. Because the analysis of basic fairness is essentially the same whether it arises under the Code of Conduct or the implied covenant of good faith and fair dealing, Plaintiff is not separately discussing both claims. The same arguments apply to Counts I and II of the Complaint.

communications to its 2016-2017 Annual Security and Fire Safety Report. (PF ¶ 17.)  That Report contained excerpts from the Williams Code of Conduct regarding sexual misconduct, including: "Consent means that at the time of the sexual contact, words or conduct indicate freely given approval or agreement, without coercion, by both participants in the sexual contact. Both parties have the obligation to communicate consent or the lack of consent." (*Id.* ¶ 19.) This was not the definition of consent that the College was using in sexual misconduct adjudications—but it is the *only* version to which it affirmatively directed students during the 2016-2017 academic year. (*Id.* ¶ 17.) The Clery Act regulations required that Williams publish in its Annual Security Report its current policies and procedures for disciplinary proceedings for allegations of sexual assault, 34 C.F.R. § 668.46(k)(1)(i), but Williams published its old policies and procedures instead.

In Doe's disciplinary case, the College used its newer definition of consent, which removed so much of the definition as stated that "[b]oth parties have the obligation to communicate consent or the lack of consent." (PF ¶ 19.) The absence of this provision likely affected the panel's decision, as the panel wrote to Sandstrom that its reasoning was partly that the responsibility for securing consent rests on the initiator. (*Id.* ¶ 107.) That language appears in neither version of the Code of Conduct, but was clearly contradicted by the plain language of the version of the Code to which the College was directing students at the time that Doe's conduct took place. (*Id.* ¶ 107)

"Meticulous adherence to definitional boundaries and notification requirements regarding what constituted consent and coercion was especially critical in determining whether discipline was appropriate on this record's factual landscape." *Doe v. Western New England Univ.*, 228 F. Supp. 3d 154, 161 (D. Mass. 2017). When Williams reviewed Doe's behavior under a code of conduct provision different from that communicated to him before his actions took place—and applied a standard found nowhere in Williams' policies and explicitly contradicted by the version

of the code of conduct disseminated to him—it failed to meet his reasonable expectations based upon the contract materials that Williams promulgated to him. *Cf. Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 332-35 (D.R.I. 2016) (university failed to meet student's reasonable expectations by applying standard of consent promulgated after conduct allegedly took place).

**2.   Williams did not give the Plaintiff timely notice of the specific allegations against him.**

In her letter informing the Plaintiff of the investigation, Sandstrom did not specify what sexual contact Smith said had taken place, or what aspects of it she said were not consensual. (PF ¶ 12.) The investigator shared limited details about Smith's allegations with Doe during the investigation, but he learned the full details of her claims only when he received the investigator's report at the end of the investigation. (*Id*. ¶ 39.) This late notice did not meet the College's obligation to provide "the specific factual conduct alleged to have given rise to the charge." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 604 (D. Mass. 2016) (hereinafter *Brandeis*); *see also Doe v. Western New England Univ.*, 228 F. Supp. 3d at 175 ("adequate warning of the misconduct that could result in a student's discipline is a fundamental element of fairness in the proceeding").

During the investigation, federal regulations required colleges to "[p]rovide[] timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings." 34 C.F.R. § 668.46(k)(3)(B)(*3*). The College's choice to withhold information from Doe until the issuance of the draft report, forcing him to go through several interviews without a full understanding of what Smith claimed took place, met neither this standard nor the Plaintiff's reasonable expectations based upon the Process's promise of a "prompt, fair, and impartial investigation and resolution." *Cf. Brandeis*, 177 F. Supp. 3d at 603 (noting disadvantage to respondent "where one party is fully informed of the subject matter of the inquiry and the other remains ignorant, and has to surmise

the specifics of the charges over the course of the investigation").

### 3. Williams denied the Plaintiff any opportunity to investigate the allegations against him.

Sandstrom's notification letter directed Doe to give her the names of any witnesses, and not to speak to other students about the case, "includ[ing] other students who you feel may have information about the case," noting that any violation would result in further disciplinary action. (PF ¶ 13.) After his first interview, Doe wrote to Sandstrom, requesting to "speak to other people who may or may not have useful information in order to try to identify additional witnesses," and promising to do so "with the utmost discretion." (*Id.* ¶ 16.) Sandstrom denied the request. (*Id.* ¶ 16.) This refusal deprived Doe of the basic ability to prepare his defense. *Cf. Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586-587 (2018) (denying motion to dismiss Title IX claim where, among other issues, plaintiff claimed that the college's directive not to discuss the allegations against him with witnesses or potential witnesses hampered his ability to prepare his own defense).

### 4. Williams denied the Plaintiff the opportunity to suggest questions for witnesses.

The College's Process stated, "The complainant and respondent may each suggest questions to the investigator to be asked of others, and may also suggest others that the investigator speak with." (PF ¶ 27.) But when Doe asked to hear what Smith's witnesses had said, the investigator declined to share their identities or statements. (*Id.* ¶ 46.) This refusal made it effectively impossible for Doe to exercise his right to suggest questions for Smith's witnesses.

Doe was offered the opportunity to request further investigation upon his receipt of the draft report. (PR ¶¶ 78, 82.) The investigation had already extended beyond the 60-day time frame Sandstrom had told Doe to expect in her initial meeting with him. (PF ¶ 15; DF ¶¶ 45, 76.) Doe received the draft report in July, when witnesses were scattered around the world and unlikely to respond quickly and participate in further meetings. (DF ¶ 76.) At that point, the option to request

7

more investigation, further prolonging the process, was no longer reasonable or meaningful.

Refusing to permit Doe to suggest questions for witness interviews departed not only from the plain written terms of the Process but also from Williams' normal practice. (PF ¶¶ 27, 46-47.) At a minimum the Process's plain text requires that both parties have an opportunity to suggest questions, based on their own knowledge of the events and the people involved, that could elicit important information. (*Id.* ¶ 27.) That opportunity is particularly critical because the College also restricts the parties from speaking directly with witnesses or conducting any investigation.[3] The refusal to permit Doe to hear what other witnesses were claiming, and respond to their claims, was a breach of contract and also, as discussed *infra*, deprived him of basic fairness. Cf. *Brandeis*, 177 F. Supp. 3d at 605.

### 5. Williams failed to interview a witness that the Plaintiff identified.

During the investigation, the investigator told Doe that one witness that he had identified had decided not to participate in the investigation. (PF ¶¶ 43, 45.) In her final report, she stated that the witness had not responded to requests to interview her. (*Id.* ¶ 44.) However, the witness had not declined to participate, and a reasonable jury could find that Williams had dropped the ball on attempting to interview her. (*Id.* ¶ 42.)

Only Doe and Smith were present during the time they spent together in Doe's room in November and January, and they told the investigator dramatically different stories about what

---

[3] When Doe raised concerns about the investigator's refusal to share the names of the complainant's witnesses or permit him to suggest questions, the Williams administrator tasked with deciding his appeal, Vice-President Leticia Haynes, responded that "respondents and complainants may not draft and submit a list of questions that the investigator must ask on their behalf. Permitting such dictation could be akin to a cross-examination of sorts, which the college's policy does not permit." (*Id.* ¶ 124.) This reasoning contradicts the plain text of the Process, which would permit parties to propose questions but not to dictate the form or manner of asking. The investigator retains discretion as to what questions to ask, when, and how.

they experienced. Both then identified witnesses to whom they had spoken about what happened after the fact. The witness who was not interviewed was one such individual; Doe spoke to her immediately after a confrontation with Smith. (*Id.* ¶ 43.) The witness's testimony would have both corroborated Doe's version of that meeting, and confirmed the consistency of his account of his past relationship with Smith. (PR ¶ 61.) Doe's own statements about his encounter with this witness and the subject matter of their discussions could not similarly bolster his credibility. Williams' failure to make adequate efforts to interview the witness, refusal to permit Doe to reach out to her, and misrepresentation of the reasons for her non-participation deprived Doe of evidence that was significant to his case. *Cf. Moe v. Grinnell Coll.*, No. 20-CV-00058-RGE-SBJ, slip op. at 24 (S.D. Iowa Aug. 23, 2021) (relying in part on "evidence demonstrating the investigator failed to interview witnesses that could have corroborated aspects of [plaintiff's] testimony" to find reason to doubt outcome of sexual misconduct investigation); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 34 (2d Cir. 2019) (allowing Title VII claim to proceed based in part on university's failure to interview relevant witnesses identified by plaintiff). *Contrast Doe v. Western New England Univ.*, 228 F. Supp. 3d at 178-179 (finding no contractual violation where the university did not contact witnesses to appear at hearing, but policies stated it was respondent's responsibility to do so.)

### 6. Williams made inconsistent and unfair decisions about what documents and information could be provided to the panel.

The Process permitted the Dean of Students to consult with the investigator, to review the report, to request that the investigator gather additional information, and to "ensure that the report does not contain material that is inadmissible in the decision process, such as irrelevant prior history." It did not permit the Dean to remove relevant information from the report or to selectively remove exhibits favorable to one party over the other. (PF ¶ 28.) Sandstrom, in consultation with Title IX Coordinator Toya Camacho, the investigator, and the College's counsel, made numerous

decisions about the contents of the report and the parties' responses to it that were unfair to Doe and outside the scope of her legitimate role set forth in the Process. (PF ¶ 58.)

After the Report was provided to Doe and Smith, Sandstrom concluded that a series of text messages between Witness B and Doe's former girlfriend, in which Witness B discussed her interactions with Smith and Witness A, did not "describe direct knowledge of the incident in question" and should be removed from the draft report. (PF ¶ 56.) But other exhibits that similarly were not based on the witnesses' first-hand knowledge, including texts between Smith's witnesses and other students, and notes that Smith's friend Witness A prepared as an advocacy document in the context of the investigation, were included over Doe's objection. (*Id.* ¶ 57.)[4]

Before the draft report was provided to the parties, Sandstrom and the investigator agreed to simply remove a page from an exhibit consisting of text messages between Witness A and another witness, but did not mark the exhibit in any way as redacted. (*Id.* ¶ 55.) In the removed exchange, Witness A expressed outrage that Doe had been selected for a prestigious Academic Program, and asked the other witness if she could help identify other women who had problems with him. (*Id.* ¶ 55.) Doe was never made aware of the exchange. (*Id.* ¶ 55.)

The draft report included statements by witnesses that Doe's acceptance to the Academic Program was a motivation for Smith to file a formal complaint. In her interviews, Smith had "denie[d] that [Doe's] acceptance into that program had any bearing on her decision to pursue the formal Title IX process." (*Id.* ¶ 60.) In her response to the draft report, she claimed for the first time that she had decided to report Doe after learning that another woman also accepted into the Academic Program had complained about him. (*Id.* ¶ 60.) Upon receipt of Smith's response,

---

[4] The notes had particular weight because in her response to the report, provided to the panel, Smith specifically referred the panel to Witness A's notes "to understand my truth." (*Id.* ¶ 59.)

Sandstrom conferred with counsel and Camacho, and decided to exclude all information about the Academic Program from the report. (*Id.* ¶ 63.) She refused to tell Doe the basis for this decision or permit him to respond to the complainant's allegations about his interactions with the other student, instead requiring him to remove references to the Academic Program from his response to the report. (DF ¶¶ 91-94.) The investigator expressed concern to Sandstrom about removing information regarding the Academic Program because Smith's explanation of her reason for reporting was inconsistent with the information provided by two of Smith's witnesses. (PF ¶ 62.)

As a result of these decisions, the Hearing Panel did not receive information that Smith had contradicted her witnesses regarding her reasons for filing a formal report, or that Smith and Witness A had sought to recruit other complainants against Doe. But it did receive Witness A's notes, and Smith's other friends' texts, sharing their opinions about Smith and Doe. While Williams frames its decision to exclude information about the Academic Program as a favor to Doe, preventing the panel from learning of other allegations against him, a reasonable jury could infer that Williams breached its contract by withholding relevant evidence from the panel, which could have altered its view of Smith's credibility. The removal of this exculpatory information violated the Process's requirement that the investigator "determine the facts of the case as completely as possible," as well as basic fairness. (*Id.* ¶ 26.) *Cf. Marymount Univ.*, 297 F. Supp. 3d at 584-85 (finding reason to doubt accuracy of investigation where "adjudicator was not provided with compelling exculpatory evidence that was omitted from the investigative report").

### 7.  **Sandstrom interfered with Doe's appeal.**

Doe appealed the panel's responsibility finding to Haynes, raising issues about the process, including about decisions that Sandstrom had made. (PF ¶¶ 119-20.) Haynes forwarded the appeal to Sandstrom and Camacho, so that Sandstrom could notify Smith. (*Id.* ¶¶ 121-22.) She did not

request Sandstrom's input into the issues that Doe raised. (*Id.* ¶ 121.) Sandstrom wrote back, sending Haynes not just the materials before the panel, but a rebuttal to Doe's arguments. (*Id.* ¶ 123.) This document was not shared with Doe and he had no opportunity to respond to it. (*Id.* ¶ 123.) Sandstrom was apparently anxious that the appeal be denied, because in correspondence with Smith's advisor prior to the panel's decision, Sandstrom expressed an assumption that Doe would be found responsible and a desire to avoid a successful appeal to limit distress to Smith. (*Id.* ¶ 78.)

The Process designated Haynes, not Sandstrom, as the decisionmaker on appeal; Sandstrom had no role in the appeal process unless she had to coordinate interviews with new witnesses. (*Id.* ¶ 34.) The Process did not permit the Dean to take on the role of a prosecutor by submitting a reply urging affirmance—particularly one that Doe could not see or rebut. These communications inappropriately interfered with Haynes' independent decision-making on appeal. *See Boston Coll. I,* 892 F.3d at 86 (finding genuine dispute of material fact where administrator discouraged panel members from choosing one verdict option).

The facts here are nearly identical to those in *Doe v. Grinnell College*, 473 F. Supp. 3d 909, 921 (S.D. Iowa 2019). There, the appeals officer asked the Adjudicator who handled earlier phases of the case for comments on the findings. The Adjudicator "responded with several pages of written comments" supporting the finding against the plaintiff. The plaintiff was "not made aware of these communications or given the opportunity to respond to the Adjudicator's comments." *Id.* The court held, "A reasonable jury could . . . conclude that Doe did not receive a fair and impartial review of his appeal and this lack of an impartial review casts doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* at 924. Here, Sandstrom's undisclosed input into the appeals process was contrary to Doe's reasonable expectations.

8.  **Decisionmakers at every stage of the case were biased against Doe.**

The training materials that Williams used to train the decisionmakers in this case—including the panelists, Sandstrom, and Haynes—were gender-biased and promoted a view of male students as violent predators. (*See infra* pp. 17-18.) Use of such materials not only subjected Doe to gender discrimination violating Title IX, *see* discussion *infra*, it breached his reasonable expectations under the Process, which specified that panelists and administrators would be trained for their roles. Doe was entitled to expect that their training would be "adequate to resolve the disputes" before them in sexual misconduct cases. *See Boston College I*, 892 F.3d at 84 (quoting *Doe v. Trs. of Bos. Coll.*, No. 15-CV-10790, 2016 WL 5799297, at *17 (D. Mass. Oct. 4, 2016)). The biased training did not meet that standard, or the Process's promise of "impartial" proceedings.

Sandstrom's involvement in the case, in particular, demonstrates bias against Doe. From her decisions about the report and evidence (*see supra* pp. 9-11), to her interference with Doe's appeal (*see supra* pp. 11-12), to her decision to rewrite the panel's reasoning in order to bolster their holding against Doe (PF ¶¶ 111-12), her bias and determination that he should be found responsible is clear in the evidence. She had a family connection to Doe, and had invited him to her home for Thanksgiving before Smith made her allegations against him. (*Id.* ¶¶ 36, 120.) She may have had a motive to treat Doe harshly in order to disassociate herself from any accusation of partiality toward him. Regulations in effect at the time required colleges to use only "officials who do not have a conflict of interest or bias for or against the accuser or the accused" in adjudicating sexual assault cases. 34 C.F.R. § 668.46(k)(3)(i)(C). Sandstrom's role violated that provision.

B.  **The College's disciplinary procedures did not afford Doe basic fairness.**

Williams' procedures failed to provide Doe basic fairness. Doe was not just denied a live hearing and the right to cross-examine or meaningfully test witnesses' testimony; although the

absence of these protections undermines fairness, *Brandeis*, 177 F. Supp. 3d at 604-05, the First Circuit has held that processes can be adequate without them. *See Boston College II* at 533-35. Williams' Process has deeper problems. Doe never had the chance to speak to the people who judged his credibility and made the life-altering decision to find him responsible for sexual assault.

Courts have held that a procedure that prevents a student from providing live testimony to the disciplinary panel and challenging the testimony of the complainant through cross-examination or a meaningful substitute violates due process rights. In *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), the Sixth Circuit found a denial of due process where a hearing panel judged the complainant to be more credible than the respondent just based on their written accounts, without "giv[ing] the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted." *Id.* at 581-83. The First Circuit, discussing the holding that "the complete absence of any examination before the factfinder" was deemed "procedurally deficient," stated that it "could easily join" the Sixth Circuit's analysis on this point. *See Haidak*, 933 F.3d at 69. Numerous other federal courts have reached similar conclusions. S*ee Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (Barrett, J.) ("in a case that boiled down to a 'he said/she said,' it is particularly concerning that . . . the committee concluded that [the complainant] was the more credible witness—in fact, that she was credible at all—without ever speaking to her in person."); *Doe v. Pennsylvania State Univ.*, 336 F. Supp. 3d 441, 449-451 (M.D. Pa. 2018) (holding that while "trial-type procedures" are not required in all cases, where the only fact in dispute was whether the sexual encounter at issue was consensual and credibility was key, a disciplinary procedure offering the panel only paperwork describing the investigation was insufficient to provide due process).

While Williams is a private institution and thus not required to provide constitutional due process, its process for judging credibility on paper, which the First Circuit has described as

"procedurally deficient," *Haidak* at 69, also deprived the Plaintiff of "basic fairness" under Massachusetts law. *See, e.g., Cloud*, 720 F.2d at 725 (stating that courts may refer to rules of evidence and constitutional standards in measuring adequacy and fairness of a hearing). Although the Supreme Judicial Court has provided limited guidance on what "basic fairness" requires under Massachusetts law,[5] Judge Saylor has suggested that what constitutes "basic fairness" "may vary depending upon the competing interests at stake, including such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature." *Brandeis*, 177 F. Supp. 3d at 601. Where the Plaintiff's entire future was at stake, those factors suggest fairness required, at the bare minimum, that the panel deciding the case hear directly from him and from Smith.[6]

Williams cites *Boston College II* for the proposition that live hearings are not required, but there, the investigators who interviewed the parties and witnesses and gathered evidence also made credibility judgments and eventually determinations of responsibility. 942 F.3d at 530-31. Even in *Brandeis*, the procedures that Judge Saylor held did not provide basic fairness at least provided for

---

[5] For this reason, Plaintiff is also submitting a motion to certify questions about the scope of the guarantee of basic fairness to the Supreme Judicial Court.

[6] The state courts of California have addressed this issue in the context of an administrative mandamus procedure under which they review disciplinary proceedings and ask whether students have received a "fair hearing." *See Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1065-66, 236 Cal. Rptr. 3d 655, 663 (2018) (citing Cal. Code Civ. Pro. § 1094.5(b)). In *Claremont McKenna*, the court held that an accused student's rights were violated where hearing procedures did not include an opportunity for the committee making the decision to "assess [the complainant's] credibility by her appearing at the hearing in person or by videoconference or similar technology, and by the Committee's asking her appropriate questions . . ."). *Id.* at 1057. Another California appellate decision found that a procedure where the adjudicator of the complaint did not interview three central witnesses, and instead relied on summaries of another investigator's interviews, denied the student a fair hearing. *Doe v. Univ. of Southern Cal.*, 29 Cal. App. 5th 1212, 1234, 241 Cal. Rptr. 3d 146, 164 (2018) ("Where a student faces a potentially severe sanction from a student disciplinary decision and the university's determination depends on witness credibility, the adjudicator must have the ability to observe the demeanor of those witnesses in deciding which witnesses are more credible.").

issues of credibility to be resolved by someone who had personally spoken with the parties and witnesses. 177 F. Supp. 3d at 579-80. The fundamental flaw in Williams' process is that it divorces the investigation process from the decision, without providing an opportunity for factfinders to judge credibility personally. None of the decisions Williams cites involves a similar fact pattern.

This key defect in Williams's procedures was sufficient to deprive Doe of basic fairness, but Williams also fell short in other ways. *See Brandeis*, 177 F. Supp. 3d at 607 (assessing "the entirety of the procedures… given the nature of the charges and the circumstances of the case"). Factors contributing to the absence of basic fairness in *Brandeis* included lack of specific notice of allegations at the outset, lack of opportunity to confront or cross-examine the complainant or witnesses, and inability to appeal on the basis that the decision was incorrect or unsupported by the evidence. *See id.* at 603-05, 607. The same factors were present here. (*See supra* pp. 6-7, 7-8, 11-12.) So were other procedural elements including dissemination of the wrong policy (*supra* pp. 4-6), a gag order preventing Doe from investigating the allegations (*supra* pp. 7-8), failure to interview Doe's witness (*supra* pp. 8-9), restrictions on information provided to the panel (*supra* pp. 9-11), biased decisionmakers (*supra* p. 13, *infra* pp. 17-19), and interference with Doe's appeal (*supra* pp. 11-12). Doe was deprived of basic fairness in the disciplinary process.

## II.   The facts support Doe's claim that Williams discriminated against him in violation of Title IX.

Title IX states that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The First Circuit has not squarely addressed the standard applicable to Title IX claims. *See Boston College I* at 90 (citing but not adopting the *Yusuf* standard, 35 F.3d at 715, modified for summary judgment). Several circuits have now declined to adopt the doctrinal test set forth in *Yusuf* and successor cases, holding instead that the various categories that

the courts have set forth "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (Barrett, J.); *see also Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235-36 (4th Cir. 2021). Those courts "ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] on the basis of sex?" *Purdue Univ.*, 928 F.3d at 667-68. This approach is preferable because it frames the inquiry squarely in the terms of the actual statute rather than imposing artificial categories on plaintiffs' claims of discrimination.

A jury could find that that the College discriminated against Doe on the basis of sex. The panelists, Sandstrom, and Haynes were trained exactly once, in the summer of 2016, on sexual misconduct and how to handle sexual misconduct cases. (PF ¶ 79.) That training was conducted by the College's Director of Sexual Assault and Prevention, Meg Bossong, whose role was support of alleged survivors of sexual assault, not participation in disciplinary or adjudicatory procedures. (*Id.* ¶ 80.) The training included a section titled, "What does an offender look like," which stated that "sexual aggression" is created by the confluence of "Impersonal Sex" and "Toxic Masculinity." (*Id.* ¶¶ 83-85.) One slide explored the "Hostile Masculinity Pathway," which according to the training incorporates a "hostile-distrustful orientation, especially towards women" by those who receive "[g]ratification from controlling or dominating women." (*Id.* ¶ 85.) The training materials state, "Offenders are intentional in their behavior," and "tend to "mistrust women's communications and to perceive them as hostile." (*Id.*) The training used a video of a researcher interviewing a male actor playing a rapist, who describes his predatory behavior toward women and his rape of a young woman, as an example of a respondent. (*Id.* ¶¶ 86-88.)

At one point in the training, participants split into groups to consider a sample scenario, drawn from a real past case. (*Id.* ¶¶ 90-91.) To hide the parties' identities, Bossong named the male respondent "Tom Riddle" (the evil Lord Voldemort from the Harry Potter books) and the female complainant "Olivia Benson" (the protagonist from Law and Order: SVU). (*Id.* ¶ 91.) The groups to reach a conclusion agreed that the respondent was guilty. (*Id.* ¶ 92.)

Judge Mastroianni's decision in another case involving panelists who received the same training is not dispositive here. His opinion references only the appearance of the words "hostile masculinity," without discussing the full contents of the materials, or the Frank video, or the sample scenario. Whether the plaintiff did not have the full materials, or did not present or argue them to the court, they were not considered in Judge Mastroianni's ruling. *See Doe v. Williams Coll.*, No. 16-CV-30184-MGM, 2021 WL 1178287, at * 10, 17 (D. Mass. 2021).

This case is distinct from *Bleiler v. College of Holy Cross*, 2013 WL 4714340, at *12 (D. Mass. 2013), which rejected a Title IX claim because the training was biased "toward the rights of reporting complainants," but not "against male students." *Id.* Here, the materials were not simply biased in favor of complainants—they advanced a gender-biased view of male students as sexual predators. Moreover, other courts <u>have</u> found gender bias where materials were biased toward complainants and against respondents. *See, e.g.*, *Doe v. Trs. of the Univ. of Penn.*, 270 F. Supp. 3d 799, 817, 824 (E.D. Pa. 2017) (denying motion to dismiss where training for employees involved in disciplinary proceedings encouraged them to believe accuser and presume accused's guilt).

Whether or not the panelists clearly recalled specific aspects of the 2016 training during their 2021 depositions (*see* DF ¶ 120) is not probative of whether they were affected by its contents when deciding this case in 2017. Doe was entitled to a decisionmaker free of bias and the "outdated and discriminatory views of gender and sexuality" contained in the training materials "would have

naturally infected the outcome" of the proceeding. *See Marymount Univ.*, 297 F. Supp. 3d at 586 (allegation concerning adjudicator's biased views, expressed in another case, were "alone [] sufficient" to create inference of gender discrimination in disciplinary proceedings). The panelists ignored inconsistencies in the complainant's statements, absence of physical evidence, and evidence that she was not forthright with her witnesses or the investigator, and misread the evidence. (PF ¶¶ 70-77, 108-110, 114.) Sandstrom altered the panel's reasoning to add that Doe's acknowledgment that he asked Smith if he could touch her breasts after she said no once to that request was evidence of sexual misconduct. (PF ¶ 111-113.) These choices, too, are evidence of bias. *See Doe v. Univ. of Denver*, 1 F.4th 822, 832-34 (10th Cir. 2021).

Camacho, who was a decisionmaker on the critical issue of what materials would and would not be included in the final report provided to panelists, expressed to Doe following the investigation that Williams could not help him deal with Smith making false statements about his participation in the College's investigation because of #metoo and Camacho's view that women needed to speak out about their experiences. (PF ¶¶ 127-129.) This refusal to address Smith's breaches of confidentiality, explicitly because of gender, supports an inference that Camacho's, and Williams's, decisions were tainted by gender bias. *See Western New England Univ.*, 228 F. Supp. 3d at 187 (indirectly quoting *Yusuf*, 35 F.3d at 715) ("statements by pertinent university officials" can be evidence of gender bias); *Doe v. Washington and Lee Univ.*, No. 14-CV-00052, 2015 WL 4647996, *10 (W.D. Va. Aug. 5, 2015) (biased statements by administrator who influenced disciplinary decision gave rise to reasonable inference of gender bias).

Williams' other choices were also collectively indicative of gender bias. *See Schwake*, 967 F. 3d at 951. These include its failure to offer Doe any options when Smith threatened him, *see Univ. of Sciences,* 961 F.3d at 210-211 (holding failure to investigate evidence that female students

violated policies was evidence of sex discrimination); its failure to give him adequate notice of the allegations, *see Schwake*, 967 F.3d at 951; its failure to interview Doe's witness, *see Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (holding accused male student's claim of gender discrimination was sufficient to survive motion to dismiss in part because university "declined to seek out potential witnesses [the student] had identified as sources of information favorable to him"); its inconsistent decision-making about which hearsay materials should go to the panel, *see Univ. of Denver*, 1 F.4th at 832 (refusal to interview respondent's witnesses was evidence of gender bias where reasons given for refusal would also have applied to complainant's witnesses, who were interviewed); its refusal to permit him to investigate the charge against him, *see Marymount Univ.*, 297 F. Supp. 3d at 586-87; its finding that he was responsible for sexual misconduct without ever hearing directly from him or the complainant, *see Purdue Univ.*, 928 F.3d at 669 (inferring bias where panelists found complainant credible without ever speaking to her); and its interference with his right to appeal, *see Doe v. Grinnell Univ.*, 473 F. Supp. 3d at 921. In short, the material facts raise a plausible inference that Williams discriminated against Doe on the basis of sex.[7]

## Conclusion

Because genuine issues of disputed material fact remain to be determined by a jury, the Court should deny the College's motion for summary judgment.

---

[7] The same result applies if the case is analyzed under the *Yusuf* framework. A plaintiff making such an "erroneous outcome" claim must allege 1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and 2) "particularized allegation[s] relating to the causal connection between the flawed outcome and gender bias." *Boston College I*, 892 F.3d at 90 (citing *Yusuf*, 35 F.3d at 715). Both elements are present here. The deficiencies of the College's process (*supra* pp. 13-16), the College's failure to fairly follow its own procedures (*supra* pp. 4-13), and the evidence casting doubt on the complainant's veracity (*supra* pp. 11, 19), all cast doubt on the accuracy of the outcome here. And the evidence of gender bias by decisionmakers (*supra* pp. 17-20), shows that gender bias was a motivating factor leading to that result. *See Yusuf*, 35 F.3d at 715 (bias by members of panel may cast doubt both on accuracy of adjudication and relate the error to gender bias).

Respectfully submitted,
John Doe
By his attorneys,

/s/David A. Russol
David A. Russcol (BBO# 670768)
Ruth O'Meara-Costello (BBO# 667566)
Zalkind Duncan & Bernstein LLP
65A Atlantic Ave.
Boston, MA 02110
617-742-6020
rcostello@zalkindlaw.com
drusscol@zalkindlaw.com

Dated: September 30, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been served on all counsel of record through the ECF system on the above date.

/s/David A. Russcol_____