UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-30024-KAR |
| | ) | |
| WILLIAMS COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
(Dkt. No. 36)

ROBERTSON, U.S.M.J.

I.   INTRODUCTION

Plaintiff John Doe's (a pseudonym) suit against Williams College ("Williams" or "the college") challenges the disciplinary proceeding that resulted in his one semester suspension from Williams for sexual misconduct with a fellow student.  Plaintiff alleges breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), and violation of Title IX of the Education Amendments of 1972 ("Title IX") (Count III).  Williams has moved for summary judgment on all claims (Dkt. No. 36).  The parties have consented to this court's jurisdiction (Dkt. No. 23).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons that follow, Defendant's motion for summary judgment is GRANTED.

II.   FACTUAL BACKGROUND[1]

---

[1] Unless another source is cited, the facts are drawn from Defendant's Statement of Undisputed Facts Filed in Support of Its Motion for Summary Judgment ("DSOF") (Dkt. No. 38), Plaintiff's Response to Defendant's Statement of Undisputed Facts ("Pl. Resp.") (Dkt. No. 42), Plaintiff's Statement of Additional Facts ("PSOF") (Dkt. No. 45), and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp.") (Dkt. No. 52).  The evidence is viewed in the light

A.    November 19, 2016, and January 11, 2017, Encounters between Doe and
      Sally Smith

On November 19, 2016, Doe, who was a sophomore at Williams, and Sally Smith (a

pseudonym), who was a Muslim and citizen of Pakistan, went for a walk and returned to Doe's

dorm room where Doe kissed Smith and touched her breasts over her shirt (DSOF ¶ 28; Pl. Resp.

¶ 28; PSOF ¶ 1; Def. Resp. ¶ 1).  Smith claimed that Doe was aware that her religious beliefs

precluded her from engaging in sexual contact and that she did not consent to either his kissing

or touching although she later said that the kissing "did not feel bad" (Pl. Tab 45/Dkt. No. 49 at

5-6).  According to Doe, Smith expressly consented to the kissing and the touching (DSOF ¶ 29;

Pl Resp. ¶ 29).  There were no witnesses to the event (PSOF ¶ 1; Def. Resp. ¶ 1).

On November 21, 2016, Smith sent Doe the following text message:

> The other night was amazing.  Although I value the emotional aspects over the physical
> ones, I've been feeling different and liberated after it.  I've not been this happy ever since
> I started college.  I just want to apologize for being so weird and awkward the entire time.
> It was because I've liked you quite a lot since the [redacted] days and even most of my
> friends know about it.  That's probably why I couldn't handle all this quite well.  I would
> be glad to get to know you more if you still wanna know me better.

(DSOF ¶ 30; Pl. Resp. ¶ 30; PSOF ¶¶ 2, 72; Def. Resp. ¶¶ 2, 72).  Four days later, Doe

responded, "hey I didn't see this sorry," "let's hang out at some point next week," and "I'm just

going to be super busy until the end of the semester . . . " (DSOF ¶ 31; Pl. Resp. ¶ 31; PSOF ¶ 2;

Def. Resp. ¶ 2).

Smith applied for a position with an international student organization in which Doe held

a leadership role (DSOF ¶ 32; Pl. Resp. ¶ 32).  On January 11, 2017, Doe and the co-leader

interviewed Smith for the position (Pl. Tab 45/Dkt. No. 49 at 6).  Smith asked to speak to Doe

---

most favorable to Plaintiff, the nonmoving party.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816,
820 (1st Cir. 1991).

after her interview and they met in Doe's dormitory room (DSOF ¶ 33; Pl. Resp. ¶ 33).  Smith

said that she wanted to tell Doe that she was uncomfortable with their November encounter and

make clear that what he did was not okay (Pl.Tab 45/Dkt. No. 49 at 6, 7).  She told Doe that he

should have known better because he held a leadership role in the international student

organization in which she participated (DSOF ¶ 33; Pl. Resp. ¶ 33).  According to Doe, Smith

accused him of being culturally insensitive in not pursuing a relationship with her after their

November encounter (DSOF ¶ 33; Pl. Resp. ¶ 33; PSOF ¶ 3; Def. Resp. ¶ 3; Pl. Tab 45/Dkt. No.

49 at 32).  He told Smith he was not emotionally available (DSOF ¶ 33; Pl Resp. ¶ 33; PSOF ¶ 3;

Def. Resp. ¶ 3).

There is no dispute that Doe kissed Smith and touched her breasts.  The parties dispute

whether Smith consented to the touching (DSOF ¶¶ 34-37; Pl. Resp. ¶¶ 34-37; PSOF ¶ 4; Def.

Resp. ¶ 4).  Doe stated that Smith consented to him putting his hand on her leg while they spoke,

but he removed it when she appeared uncomfortable (DSOF ¶ 34; Pl. Resp. ¶ 34).  According to

Doe, Smith expressly consented to his request to kiss her (DSOF ¶ 36; Pl. Resp. ¶ 36; PSOF ¶ 4;

Def. Resp. ¶ 4).  He indicated that they both ran their hands along the other's torso and kissed.

They leaned into each other (DSOF ¶ 36; Pl. Resp. ¶ 36).  For her part, Smith alleged that Doe

did not seek her consent before he kissed her and some of the kissing was violent (DSOF ¶ 37;

Pl. Resp. ¶ 37; Pl. Tab 45/Dkt. No. 49 at 7-8).  Doe claimed that when he asked permission to

touch Smith's breasts, she told him that he could touch her wherever he wanted and he touched

her breasts over her shirt (DSOF ¶ 36; Pl. Resp. ¶ 36).  He alleged that he sought permission to

touch her breasts under her shirt and she initially said no (DSOF ¶ 36; Pl. Resp. ¶ 36; PSOF ¶ 4;

Def. Resp. ¶ 4).  After Smith purportedly said, "[Doe], I love everything you do" in response to

his request to kiss her neck, Doe repeated his request to touch her breasts under her shirt and she

said yes (DSOF ¶ 36; Pl. Resp. ¶ 36; PSOF ¶ 4; Def. Resp. ¶ 4). When Doe asked to kiss Smith's breasts, Smith indicated that they were "moving too fast," and Doe stopped (DSOF ¶ 36; Pl. Resp. ¶ 36; Pl. Tab 45/Dkt. No. 49 at 32). Smith, on the other hand, denied consenting to Doe touching her breasts and indicated that she repeatedly said "no" during the encounter (DSOF ¶ 37; Pl. Resp. ¶ 37).

On January 17, 2017, Smith confronted Doe about his insensitivity and demanded that he resign from his leadership position in the campus organization (PSOF ¶ 5; Def. Resp. ¶ 5; Pl. Tab 45/Dkt. No. 49 at 8-9). According to Doe, Smith threatened that "lots of people [were] ready to hurt [him]" if he did not resign the next morning (Pl. Tab 45/Dkt. No. 49 at 12). Immediately thereafter, a visibly distressed Doe encountered some friends and described his encounter with Smith and his history with her (PSOF ¶ 6; Def. Resp. ¶ 6). Doe resigned from the leadership position the next morning (Pl. Tab 45/Dkt. No. 49 at 12-13).

Doe contacted Ninah Pretto, the Dean of International Students, about Smith's demand that he resign his position (PSOF ¶ 7; Def. Resp. ¶ 7). Pretto referred Doe to Meagan Bossong, the Director of Sexual Assault Prevention and Response (PSOF ¶ 7; Def. Resp. ¶ 7). Doe e-mailed Bossong on January 18, 2017 and gave his account of what occurred during his encounters with Smith on November 19, 2016 and January 11, 2017 (Def. Tab 11). Bossong referred Doe to Marlene Sandstrom, the Dean of the College (PSOF ¶ 7; Def. Resp. ¶ 7). Although Doe met with Sandstrom, he did not recall them discussing the option of him pursuing a complaint against Smith (PSOF ¶ 8; Def. Resp. ¶ 8).

B.    Williams College's Code of Conduct

In October 2016, Williams circulated its 2016-2017 Annual Security and Fire Safety Report ("Clery Report") (Pl. Tab 43/Dkt. No. 46-7 at 2). The Clery Report stated, "[a]ll students

4

should be familiar with the policies and Code of Conduct regarding sexual misconduct, as posted

on the website of the Dean of the College and copied here" (PSOF ¶ 18; Def. Resp. ¶ 18)

(emphasis added).  The Code of Conduct in the 2016-2017 Clery Report defined "sexual

misconduct" as including "any form of sexual assault" (Pl. Tab 43/Dkt. No. 46-7 at 18).  "Sexual

assault" meant "any non-consensual sexual intercourse or other non-consensual sexual contact,"

which was defined as "[a]ny sexual touching, however slight; with any object; by any person

upon any other person; without effective consent (DSOF ¶ 8; Pl. Resp. ¶ 8; Pl. Tab 43/Dkt. No.

46-7 at 18).  Consent was defined as follows:

> **Consent:**  Consent is a crucial part of both the Williams Code of Conduct and
> Massachusetts law.  The Williams College Code of Conduct requires consent for all
> sexual activity.  Consent means that at the time of the sexual contact, words or conduct
> indicate freely given approval or agreement, without coercion, by both participants in the
> sexual contact.  Both parties have the obligation to communicate consent or the lack of
> consent.  A verbal "no" (no matter how indecisive) or resistance (no matter how passive)
> constitutes the lack of consent.  In addition, consent once given may be withdrawn at any
> time.  If consent is withdrawn, the other party must immediately stop whatever sexual
> contact is occurring.
>
> **An individual is unable to give consent if he or she is:**
>
> - substantially physically or mentally impaired by alcohol, or drugs
> - forced or threatened
> - physically incapable of resisting, asleep, or unconscious

(PSOF ¶ 19; Def. Resp. ¶ 19; Pl. Tab 43/Dkt. No. 46-7 at 17).

Williams, however, had amended the definition of consent in its Code of Conduct before

it distributed the 2016-2017 Clery Report (PSOF ¶ 20; Def. Resp. ¶ 20).  The amended definition

was as follows:

> Consent is a crucial part of the both the Williams Code of Conduct and
> Massachusetts law.  The Williams College Code of Conduct requires affirmative
> consent for all sexual activity.  Consent means that at the time of the sexual
> contact, words and conduct indicate freely given approval or agreement, without
> coercion, by all participants in the sexual contact.  Consent may not be inferred
> from silence or passivity.  In addition, consent once given may be withdrawn at

any time.  If consent is withdrawn, whatever sexual contact is occurring must immediately stop.

**Individuals are unable to give consent if they are:**

- substantially physically or mentally impaired by illness, alcohol, or drugs
- forced, coerced, threatened or subject to intimidation
- physically incapable of communicating, asleep, or unconscious

(DSOF ¶ 9; Pl. Resp. ¶ 9; PSOF ¶ 21; Def. Resp. ¶ 21; Def. Tab 8/Dkt. No. 38-10 at 8).

The 2016-2017 Code of Conduct, including the 2016-2017 amended definition of consent, was posted on the college's website and an April 5, 2016, Letter to the Williams Community on Sexual Assault Prevention and Response had a link to the website that contained the 2016-2017 amended definition (PSOF ¶ 17; Def. Resp. ¶ 17).

C.   Williams College's Process for Adjudicating Sexual Misconduct Complaints

The Code of Conduct stated, "When violations [of the Code of Conduct] are determined to have occurred, the College will impose disciplinary sanctions on students and employees, consistent with local, state, and federal law" (PSOF ¶ 22; Def. Resp. ¶ 22).  The 2016-2017 Clery Report included the "College Investigation and Adjudication Process for Sexual Misconduct (including sexual assault and sexual exploitation) and for Stalking, Dating Violence, and Domestic Violence" (the "Process") (PSOF ¶ 23; Def. Resp. ¶ 23; Pl. Tab 43/Dkt. No. 46-7 at 29-31).[2]

The Process provided that "[t]he College's procedures seek to ensure a prompt, fair, and impartial investigation and resolution" of a sexual misconduct complaint (DSOF ¶ 11; Plf. Resp. ¶ 11; PSOF ¶ 31; Def. Resp. ¶ 31; Pl. Tab 43/Dkt. No. 46-7 at 29).  The Dean of the College,

---

[2] Although the Process set forth in the 2016-2017 Clery Report was not the version of the Process in effect for the 2016-2017 academic year, the parties agree that the differences between the two versions were inconsequential (PSOF ¶ 24; Def. Resp. ¶ 24).

acting in her role as Deputy Title IX Coordinator for the College, oversaw the Process involving a complaint against a student (DSOF ¶ 22; Pl. Resp. ¶ 22).  Deans were assigned to assist the complainant and respondent (Pl. Tab 43/Dkt. No. 46-7 at 29, 31).  In addition, each party had the right to have an advisor of their choosing with them at every step of the process, including meetings with campus officials, the investigator, and the hearing panel (DSOF ¶ 20; Pl. Resp. ¶ 20; Pl. Tab 43/Dkt. No. 46-7 at 31).

   1. Investigation

  When a student filed a complaint alleging sexual misconduct, the Process directed the Dean of the College to assign a trained investigator to determine the facts of the case as completely as possible by taking statements, obtaining evidence, and asking follow-up questions (DSOF ¶ 12; Pl. Resp. ¶ 12; PSOF ¶ 26; Def. Resp. ¶ 26; Pl. Tab 43/Dkt. No. 46-7 at 30).  The Process further stated that "[t]he complainant and respondent may each suggest questions to the investigator to be asked of others and may also suggest others that the investigator speak with. Final decisions about whom to talk with and what to ask will be made by the investigator. . . . The investigator may consult with the Dean of the College in decisions regarding the investigation process" (DSOF ¶¶ 13, 14; Pl. Resp. ¶¶ 13, 14; PSOF ¶ 27; Def. Resp. ¶ 27; Pl. Tab 43/Dkt. No. 46-7 at 30).

  The investigator was directed to produce a report of his or her factual findings and the evidence (DSOF ¶ 12; Pl. Resp. ¶ 12; PSOF ¶ 26; Def. Resp. ¶ 26; Pl. Tab 43/Dkt. No. 46-7 at 30).  After reviewing the report, the Dean of the College could "request that additional information be gathered" (DSOF ¶ 16; Pl. Resp. ¶ 16; Pl. Tab 43/Dkt. No. 46-7 at 30).  "The Dean . . . also ensure[d] that the report [did] not contain material that [was] inadmissible in the decision process, such as irrelevant prior sexual history" (DSOF ¶ 16; Pl. Resp. ¶ 16; PSOF ¶ 28;

Def. Resp. ¶ 28; Pl. Tab 43/Dkt. No. 46-7 at 30).  The completed report was shared with the complainant and respondent each of whom could provide a written response (DSOF ¶ 15; Pl. Resp. ¶ 15; PSOF ¶ 26; Def. Resp. ¶ 26; Pl. Tab 43/Dkt. No. 46-7 at 30).

        2.      Primary Adjudication

A hearing panel of three staff members, who were trained to hear sexual misconduct cases, were appointed by the Dean of the College to determine whether a student violated the Code of Conduct (DSOF ¶ 17; Pl. Resp. ¶ 17; PSOF ¶¶ 26, 29; Def. Resp. ¶¶ 26, 29; Pl. Tab 43/Dkt. No. 46-7 at 30).  The complainant and respondent had the opportunity to object to the participation of a panel member on the basis of bias or any other reason that would prevent them from fairly assessing the evidence (Pl. Tab 43/Dkt. No. 46-7 at 30).  The Dean of the College made the final decision concerning recusal (Pl. Tab 43/Dkt. No. 46-7 at 30).  After reading and discussing the statements gathered by the investigator, the investigator's report, and the complainant's and respondent's responses to the report, if any, the hearing panel decided "whether there [was] a preponderance of the evidence showing a violation of the college's [C]ode of [C]onduct" (DSOF ¶ 17; Pl. Resp. ¶ 17; PSOF ¶ 26; Def. Resp. ¶ 26; Pl. Tab 43/Dkt. No. 46-7 at 30).  Two affirmative votes were required for a finding of a code violation (Pl. Tab 43/Dkt. No. 46-7 at 30).

If the panel made a finding of sexual misconduct, the complainant and respondent had the opportunity to briefly and separately address the hearing panel before the panel determined the sanction (DSOF ¶ 18; Pl. Resp. ¶ 18; Pl. Tab 43/Dkt. No. 46-7 at 30).  The complainant and respondent were not permitted to discuss the facts of the case (DSOF ¶ 18; Pl. Resp. ¶ 18; Pl. Tab 43/Dkt. No. 46-7 at 30).  Instead, both parties were afforded an opportunity "to present directly to the committee in their own 'voice' any additional information, including information

about the impact of the incident in question" (DSOF ¶ 18; Pl. Resp. ¶ 18; Pl. Tab 43/Dkt. No. 46-7 at 30).

The hearing panel then determined the sanction, which included "the full range of disciplinary sanctions available at the college, including suspension from the college for one or more semesters, and expulsion" (DSOF ¶ 18; Pl. Resp. ¶ 18; PSOF ¶ 32; Def. Resp. ¶ 32; Pl. Tab 43/Dkt. No. 46-7 at 30).  The Dean of the College communicated the decision and sanction in writing to the parties (DSOF ¶ 19; Pl. Resp. ¶ 19; Pl. Tab 43/Dkt. No. 46-7 at 30).

3.      Appeal

Both parties had the right to appeal the hearing panel's decision to Leticia S.E. Haynes, the Vice President for Institutional Diversity and Equity (DSOF ¶ 21; Pl. Resp. ¶ 21; PSOF ¶ 34; Def. Resp. ¶ 34; Pl. Tab 43/Dkt. No. 46-7 at 30).  A party was not permitted to appeal on the ground that the panel's decision was incorrect or was not supported by the evidence (PSOF ¶ 33; Def. Resp. ¶ 33).  "Appeals [were] granted only in cases where the procedural problems or new evidence [were] substantive enough to have significantly affected the outcome of the initial hearing" (Pl. Tab 43/Dkt. No. 46-7 at 31).  The results of the appeal process were final and were communicated to the parties by the Dean of the College (Pl. Tab 43/Dkt. No. 46-7 at 31).

D.      April 2017:  Smith's Complaint and Next Steps

After Doe was selected to participate in an Oxford University program offered through Williams (the "Oxford Program") in early March 2017 (PSOF ¶ 9; Def. Resp. ¶ 9), Smith formally accused Doe of sexual misconduct during their encounters on November 19, 2016, and January 11, 2017 (DSOF ¶ 44; Pl. Resp. ¶ 44; PSOF ¶ 10; Def. Resp. ¶ 10).  Sandstrom's April 10, 2017, letter to Doe informed him that the college was commencing an investigation into Doe's possible "non-consensual sexual interaction" with Smith in November 2016 and January

9

2017 (DSOF ¶ 47; Pl. Resp. ¶ 47; PSOF ¶¶ 11, 12; Def. Resp. ¶¶ 11, 12).  Sandstrom included provisions of the Code of Conduct, including the 2016-2017 amended definition of consent, with her letter (PSOF ¶¶ 21, 24; Def. Resp. ¶¶ 21, 24).

When Sandstrom met with Doe, she asked him to provide her with the names of any witnesses (PSOF ¶ 13; Def. Resp. ¶ 13).  She further directed Doe not to discuss the case with other students, including those whom he believed might have information, and told him that a violation of confidentiality would result in a separate disciplinary process (PSOF ¶ 13; Def. Resp. ¶ 13).  Sandstrom's letter mentioned that the Process would be completed within sixty days and included a "Sexual Misconduct, Dating/Domestic Violence, and Stalking Discipline Process Outline" that described the steps in the Process, the reasons for the steps, and the approximate time it would take to complete each step (PSOF ¶ 15; Def. Resp. ¶ 15; Pl. Tab 56/Dkt. No. 46-20).  On or around April 14, 2017, Doe retained an attorney to serve as his legal adviser (DSOF ¶ 54; Pl. Resp. ¶ 54).

E.   The Investigation

As the Deputy Title IX Coordinator, Sandstrom oversaw the investigation into Smith's complaint (PSOF ¶ 35; Def. Resp. ¶ 35).  Doe had a distant family connection to Sandstrom but was not related by blood (DSOF ¶ 159; Pl. Resp. ¶ 159; PSOF ¶ 36; Def. Resp. ¶ 36).  Doe's father was raised by a family that had several children.  One of those children married Sandstrom's sister (DSOF ¶ 159; Pl. Resp. ¶ 159).  Sandstrom had not met Doe before he attended Williams and did not know Doe until he introduced himself and explained the connection between his father and her brother-in-law (DSOF ¶¶ 161, 162; Pl. Resp. ¶¶ 161, 162).  Sandstrom invited Doe to Thanksgiving dinner at her home in November 2016 along with at least ten other people (DSOF ¶ 163; Pl. Resp. ¶ 163; PSOF ¶ 37; Def. Resp. ¶ 37).  Doe did not

seek favorable treatment from Sandstrom, nor was he accused of seeking favorable treatment from her (DSOF ¶ 164; Pl. Resp. ¶ 164).

During Doe's first interview with the assigned investigator, attorney Allyson Kurker, she offered Doe the opportunity to identify possible witnesses to Sandstrom and said she "'want[ed] to hear from those people'" (DSOF ¶¶ 58, 58; Pl. Resp. ¶¶ 57, 58). Doe identified four witnesses (DSOF ¶ 59; Pl. Resp. ¶ 59). Doe also responded to Kurker's request to provide documentary evidence (DSOF ¶ 70; Pl. Resp. ¶ 70). Doe then sent Sandstrom an e-mail message indicating that he had identified "a few witnesses" to the investigator and requested permission to "'speak to other people who may or may not have useful information in order to try to identify additional witnesses . . . so that [he could] adequately defend himself . . . '" (DSOF ¶ 62; Pl. Resp. ¶ 62; PSOF ¶ 16; Def. Resp. ¶ 16). Sandstrom denied Doe's request based on the college's confidentiality policy,[3] which expressly forbade a respondent from conducting a factual investigation or speaking to witnesses. Sandstrom told Doe that he could provide her with the names of additional students who he thought might have useful information (DSOF ¶ 64; Pl. Resp. ¶ 64; PSOF ¶¶ 16, 41; Def. Resp. ¶¶ 16, 41).[4] She would e-mail each student Doe

---

[3] The parties dispute whether Smith was also warned about confidentiality (PSOF ¶ 14; Def. Resp. ¶ 14). It is undisputed that, during Kurker's first interview of Smith, Kurker directed Smith not to discuss their interviews with others (Pl. Tab 46/Dkt. No. 49-6 at 3).

[4] The policy, entitled "Confidentiality in Sexual Misconduct Cases: Information for Respondents," stated that during the investigation and adjudication process, subject to certain exceptions that are not relevant here, "all parties involved in the process (complainant, respondent, witness and advisors) are forbidden to discuss the case or to share materials related to the case with anyone, including potential witnesses" (DSOF ¶¶ 23, 24; Plf. Resp. ¶¶ 23, 24; Def. Tab 9/Dkt. No. 38-11 at 2). The college's confidentiality policy further provided that "[a]fter the case concludes completely, . . . [t]he materials and information learned in the disciplinary process itself are confidential. . . . Each student's experience is their own, and they may discuss it with others if they wish to do so with certain limitations. Respondents may share that they were a respondent in a sexual misconduct case, how the case turned out, and how they

11

identified and ask if the student would be willing to speak to the investigator and would provide Kurker with the names of students who were willing to participate in the investigation (DSOF ¶ 64; Pl. Resp. ¶ 64).  Kurker would decide whether any such student had useful information to contribute (DSOF ¶ 64; Pl. Resp. ¶ 64).  Doe did not identify any additional potential witnesses to Sandstrom (DSOF ¶ 65; Pl. Resp. ¶ 65).

Kurker interviewed three of the four witnesses identified by Doe (DSOF ¶ 59; Pl. Resp. ¶ 59).  The fourth was a friend Doe encountered shortly after Smith insisted he resign from his leadership position in the international student organization (PSOF ¶ 43; Def. Resp. ¶ 43). According to Kurker's report, the witness did not respond Kurker's requests to interview her (DSOF ¶ 60; Pl. Resp. ¶ 60; PSOF ¶ 44; Def. Resp. ¶ 44).  Kurker told Doe that the witness had decided not to participate (PSOF ¶ 45; Def. Resp. ¶ 45).

When Kurker interviewed Doe, she read portions of Smith's interview to him and asked him to respond (DSOF ¶ 67; Pl. Resp. ¶ 67).  Although Kurker told Doe what his witnesses said during their interviews, she declined, at that point, to identify Smith's witnesses or tell him what they said (DSOF ¶¶ 68, 69; Pl. Resp. ¶¶ 68, 69; PSOF ¶ 46; Def. Resp. ¶ 46).  Kurker did not give Doe transcripts or recordings of her interviews with Doe, Smith, or the other witnesses (PSOF ¶¶ 48, 49; Def. Resp. ¶¶ 48, 49).

    F.    <u>The Investigator's Drafts and Final Reports</u>

        1.    June 30, 2017:  First Draft of the Report

Before Kurker provided her report to the parties, she circulated it to Sandstrom and Title IX Coordinator Toya Camacho who jointly reviewed all of the case materials before they were

---

felt about it.  They may not share the name or any other identifying information about the complainant or any witness" (Def. Tab 9/Dkt. No. 38-11 at 2; Def. Tab 10/Dkt. No. 38-12 at 2)

submitted to the hearing panel (PSOF ¶¶ 50, 51; Def. Resp. ¶¶ 50, 51).  Kurker's initial draft

included the 2016-2017 Clery Report's definition of consent (PSOF ¶ 53; Def. Resp. ¶ 53).

Sandstrom asked Kurker to change the definition to the 2016-2017 amended version (PSOF ¶ 53;

Def. Resp. ¶ 53).  Sandstrom and Kurker agreed to remove a page from the draft report that

contained text messages between Witness A, Smith's JA, and another witness, in which Witness

A voiced outrage that Doe had been selected for the Oxford Program and asked the other witness

if she could help identify other women who had problems with Doe (DSOF ¶ 74; Pl. Resp. ¶ 74;

PSOF ¶ 55; Def. Resp. ¶ 55).  Doe and Smith were not told this material had been removed.

> 2.      July 5, 2017:  Second Draft of the Report

The second draft report included summaries of Kurker's two interviews and one e-mail

exchange with Smith, four interviews with Doe, their responses to the other party's interviews

(DSOF ¶¶ 55, 75; Pl. Resp. ¶¶ 55, 75; Def. Tab 16), summaries of the investigator's interviews

with eight witnesses, and seventeen exhibits (DSOF ¶¶ 55, 76, 77; Pl. Resp. ¶¶ 55, 76, 77; Def.

Tab 16).  Doe and Smith provided Kurker very different versions of their physical interactions

and whether and how Smith consented to sexual activity during their encounters (PSOF ¶ 40;

Def. Resp. ¶ 40).  Although Kurker identified disputed and undisputed facts, she did not make

credibility determinations or comment on demeanor (PSOF ¶¶ 52, 97; Def. Resp. ¶¶ 52, 97).

On July 5, 2017, Sandstrom e-mailed Kurker's second draft to Doe, indicating:

> The next steps are for you to review the report and to provide, in writing, any response or
> commentary that you wish the hearing panel to be aware of.  For example, you may
> comment on any place in which there is additional information you feel is important, or
> any place where you are not accurately represented.  You may also state in your response
> if you feel there are additional people who have information that is relevant to this matter
> who have not yet been interviewed or if you believe there are additional questions that
> should be asked of those who have been interviewed already.  In that case, Ms. Kurker
> will decide whether or not to conduct additional interviews and produce an updated
> report.

(DSOF ¶ 78; Pl. Resp. ¶ 78; Def. Tab 15 at WC-004487).  Doe worked with his attorney to prepare his response to Kurker's second draft report (DSOF ¶ 81; Pl. Resp. ¶ 81; Def. Tab 17 at WC-004473 to WC-004480).  Doe's so-called factual clarifications included his version of the events at issue and responses to the interviews of Smith and others summarized in Kurker's report (DSOF ¶ 80; Pl. Resp. ¶ 80; Def. Tab 17 at WC-004473 to WC-004480).  Doe also commented on Smith's credibility (DSOF ¶ 80; Pl. Resp. ¶ 80; Def. Tab 17 at WC-004480 to WC-04483).  Doe did not identify additional witnesses or supplemental questions although he understood he could do so (DSOF ¶¶ 82, 83; Pl. Resp. ¶¶ 82, 83).

When he received the draft report, Doe learned for the first time that Smith had allegedly suffered a bruised lip or ear after their January encounter (PSOF ¶ 67; Def. Resp. ¶ 67).  There were no photographs of any injuries (PSOF ¶ 68; Def. Resp. ¶ 68).  Smith's friends who spoke with her after her January 11, 2017, encounter with Doe told Kurker what they had (or had not) observed (Pl. Tab 45/Dkt. No. 49 at 20-29).

3.    July 25, 2017:  Third Draft of the Report

After Kurker provided the second draft report to Smith and Doe, Sandstrom decided to remove a series of messages between Witness B and Doe's former girlfriend in which Witness B described her interactions with Smith and Witness A ("former Exhibit N") (DSOF ¶ 86; Pl. Resp. ¶ 86; PSOF ¶ 56; Def. Resp. ¶ 56).  Sandstrom determined that the messages did not describe direct knowledge of the incident in question and contained character evidence and speculation (DSOF ¶ 86; Pl. Resp. ¶ 86; PSOF ¶ 56; Def. Resp. ¶ 56).  When Doe objected to removing all of the messages, Sandstrom agreed that the two portions that Doe identified, including Witness A's encouragement to Smith to use the term "sexual assault," should be included in the report (DSOF ¶¶ 87, 88; Pl. Resp. ¶¶ 87, 88; Pl. Tab 50/Dkt. No. 46-14 at 4-6).  Sandstrom also agreed with

14

Doe's recommendations that the final report should include his conversation with Smith in which, he claimed, she distinguished another student's "unwanted advances" from her feelings toward Doe, and should exclude Witness B's opinion and speculation about Doe's culpability because it was not based on personal observation (DSOF ¶¶ 84, 85, 97, 98; Pl. Resp. ¶¶ 84, 85, 97, 98; Def. Tab 19/Dkt. No. 38-21 at 2; Pl. Tab 50/Dkt. No. 46-14 at 2-3).

Sandstrom excluded information about the Oxford Program from Kurker's report and from the parties' responses over Doe's objection (DSOF ¶¶ 91, 93; Pl. Resp. ¶¶ 91, 93; PSOF ¶ 64; Def. Resp. ¶ 64). Kurker's initial draft stated that Smith's witnesses believed that Doe's acceptance into the Oxford Program prompted Smith to file the formal complaint (DSOF ¶ 89; Pl. Resp. ¶ 89; PSOF ¶ 60; Def. Resp. ¶ 60). Smith denied that motive (DSOF ¶ 90; Pl. Resp. ¶ 90; PSOF ¶ 60; Def. Resp. ¶ 60). She explained that she felt compelled to complain after another female student, who was planning to attend the Oxford Program, confided that she, too, had been a target of sexual misconduct by Doe (DSOF ¶ 90; Pl. Resp. ¶ 90). Although Kurker expressed some concern about deleting conflicting evidence about Smith's motive for filing the complaint, after consulting with Camacho, Sandstrom excluded references to the Oxford Program because evidence of another student's allegation of possible sexual misconduct by Doe would be prejudicial to him but excluding Smith's explanation of her reasons for filing would give the hearing panel an incomplete picture of the evidence about Smith's motivation (DSOF ¶¶ 92, 94, 95; Pl. Resp. ¶¶ 92, 94, 95; PSOF ¶¶ 62, 63, 64; Def. Resp. ¶¶ 62, 63, 64).

Doe also objected to witness statements attached to Kurker's report on the ground that they were not based on first-hand knowledge of his encounters with Smith (DSOF ¶ 99; Pl. Resp. ¶ 99; PSOF ¶ 57). Doe alleged that Witness A's notes (Exhibit K) were prepared as an advocacy document for Smith and expressed Witness A's opinions about Doe, Smith, and their situation

(PSOF ¶ 57; Def. Resp. ¶ 57; Def. Tab 22 at WC-004109 to WC-004113).[5]  The other exhibits to which Doe objected were, for the most part, students' text messages recounting what Smith told them about her January 11, 2017 encounter with Doe (DSOF ¶¶ 100, 101, 103, 104; Pl. Resp. ¶¶ 100, 101, 103, 104).  Deeming Smith's accounts of her encounters with Doe and her actions after the encounter relevant to the hearing panel's decision and appropriate for their consideration, Sandstrom denied Doe's request to exclude the four exhibits (DSOF ¶ 105; Pl. Resp. ¶ 105).

> ### 4.    August 1, 2017:  Final Report

On August 1, 2017, the parties and the hearing committee received Kurker's final report, which incorporated some of Doe's suggested modifications, the exhibits, the parties' responses to the final report, and the 2016-2017 amended definition of consent (Pl. Tab 45/Dkt. No. 49; Pl. Tab 51/Dkt. No. 49-4; Pl. Tab 53/Dkt. No. 49-5).[6]  Sandstrom's August 2, 2017, e-mail message to Doe stated:

> When the panel deliberates, they will consider the investigative report and both parties' responses to that report.  I am attaching, for your information [Smith's] response to the report.  The College's procedures do not provide for responses to the responses, so please understand that I am not soliciting, and will not accept, any response to her response.  If, however, you believe her response includes substantive new information that requires further investigation, please let me know within 5 days and I will consider whether any follow-up by the investigator is necessary.

(DSOF ¶ 108; Pl. Resp. ¶ 108).  Doe did not request further investigation (DSOF ¶ 109; Pl. Resp. ¶ 109).

> ### G.    The Hearing Panel

---

[5] In Smith's response to Kurker's final report, Smith directed the panel to Witness A's notes "to understand [Smith's] truth" (PSOF ¶ 59; Def. Resp. ¶ 59).

[6] Doe revised his July 15, 2017, response to reflect changes that were made in Kurker's final report (Dkt. No. 46-14 at 2; Pl. Tab 53/Dkt. No. 49-5).

As the hearing panel, Sandstrom selected Chief Information Officer Barron Koralesky; Head of Research Services and Library Outreach Christine Menard; and Human Resources Coordinator Vishakha Sheoran (DSOF ¶ 110; Pl. Resp. ¶ 110).  Doe was told who had been selected and could have objected on the grounds of bias.  He did not raise any concerns (DSOF ¶ 111; Pl. Resp. ¶ 111).  All of the panelists had attended a training session on June 20, 2016 (DSOF ¶ 114; Pl. Resp. ¶ 114).  Sandstrom used some of the June 2016 training slides to provide a refresher training for the panelists before they heard Doe's case (DSOF ¶¶ 126, 127; Pl. Resp. ¶¶ 126, 127; PSOF ¶ 94; Def. Resp. ¶ 94).  The refresher did not address the facts of Doe's case (DSOF ¶ 128; Pl. Resp. ¶ 128).

H.    The Hearing Panel's Deliberations, Findings, and Decision

After reviewing Kurker's report and the 2016-2017 Code of Conduct, including its definition of consent, and deliberating, the hearing panel found, by a preponderance of the evidence, that Doe did not engage in sexual misconduct on November 19, 2016 because the evidence of consent was unclear, but did engage in sexual misconduct on January 11, 2017 (DSOF ¶¶ 134, 136, 138; Pl. Resp. ¶¶ 134, 136, 138; PSOF ¶ 98; Def. Resp. ¶ 98; Pl. Tab 62/Dkt. No. 46-26 at 2).  The panel's decision was unanimous (DSOF ¶¶ 129, 143; Pl. Resp. ¶¶ 129, 143; PSOF ¶¶ 100, 102; Def. Resp. ¶¶ 100, 102; Pl. Tab 45/Dkt. No. 49 at 4).  The panel did not hear live testimony and did not have audio recordings or transcripts of Kurker's interviews (PSOF ¶¶ 101, 103; Def. Resp. ¶¶ 101, 103).

As to January 11, 2017, the hearing panel found that: Doe "may not have intended to contact [Smith] in an unwelcome manner, but consent needs to be explicitly given and that

responsibility rests on [the] initiator";[7] between the November 17th encounter and January 11th, Smith's Facebook message to Doe "made it clear" that she valued the emotional aspects of their friendship over the physical ones; Smith discussed her discomfort with the November encounter with "many witnesses;" Smith met Doe on January 11 intending "to confront [him] about the event in November and to set expectations for her friendship with [Doe];" and Doe's January 18, 2017 e-mail message to Bossong, which was an exhibit to Kurker's report, indicated that Smith "was able to convey some of this [on January 11] and [Doe] heard it" (DSOF ¶¶ 141, 146; Pl. Resp. ¶¶ 141, 146; PSOF ¶¶ 107, 108, 109; Def. Resp. ¶¶ 107, 108, 109; Def. Tab 5/Dkt. No. 38-7 at 17-18; Pl. Tab 62/Dkt. No. 46-26 at 2-3).[8]  The panel found that it was more likely than not that Smith said "no" to sexual contact with Doe and he failed to comply (DSOF ¶ 142; Pl. Resp. ¶ 142).

Sandstrom used the hearing panel's August 22, 2017, findings as a basis to draft a letter for their review (DSOF ¶ 147; Pl. Resp. ¶ 147).  Sandstrom's cover message to the panel stated, "let me know if I have accurately captured your reasoning.  Please make any changes that you need to make sure this reflects your thinking" (DSOF ¶ 147; Pl. Resp. ¶ 147).  The panel provided some edits and approved the letter's final language (DSOF ¶ 148; Pl. Resp. ¶ 148).  The

---

[7] During his deposition, Koralesky said it was his belief that consent to sexual activity had to be communicated explicitly and primarily verbally (PSOF ¶ 104; Def. Resp. ¶ 104).

[8] Doe's January 18, 2017, e-mail message to Bossong stated that, on January 11, Smith discussed his "mistreat[ment] of her and that [he] should have known better as [a leader of the student organization]" (Def. Tab 11 at WC-004087).  Doe disputed the hearing panel's interpretation of that message (PSOF ¶ 110).  According to Doe, his message to Bossong "made clear [his] understanding that when Smith confronted him on January 11, she felt that he had mistreated her by not moving forward with a relationship after kissing her, not that she felt he had done anything without her consent" (PSOF ¶ 110)

August 23, 2017, letter to Doe summarized the hearing panel's decision as to the January 11,

2017, encounter as follows:

> The fact that [Smith] came to view the November incident as nonconsensual
> (corroborated by several witnesses), that she told you on January 11th . . . that she
> felt you had mistreated her on the previous occasion [and you were aware of her
> feeling], and that she expressed a clear "no" to several of your sexual overtures
> over the course of the encounter, led us to find [Smith's] account that she did not
> provide affirmative consent to be the more credible account.  While we
> acknowledge that you may not have intended to engage in nonconsensual sexual
> contact, we find a preponderance of the evidence that you did, in fact, do so.

(DSOF ¶ 149; Pl. Resp. ¶ 149).

I.      The Sanction

The panel's August 23, 2017, letter notified Doe that he could address the hearing panel

in person, by phone or Skype, or in writing before they determined the sanction (DSOF ¶ 150;

Pl. Resp. ¶ 150).  He addressed them in person (DSOF ¶ 151; Pl Resp. ¶ 151; PSOF ¶ 117; Def.

Resp. ¶ 117).  The panel imposed a one-semester suspension (DSOF ¶ 153; Pl. Resp. ¶ 153;

PSOF ¶ 118; Def. Resp. ¶ 118).  Sandstrom advised Doe that the sanction would not appear on

his academic transcript (DSOF ¶ 154; Pl. Resp. ¶ 154).

J.      Doe's Appeal

On September 15, 2017, Doe submitted his appeal to Haynes (DSOF ¶ 155; Pl. Resp. ¶

155; PSOF ¶ 119; Def. Resp. ¶ 119).  Doe, with the assistance of his attorney, raised the

following alleged procedural errors:  the investigator failed to share information about Smith's

witnesses which prevented him from suggesting questions for the witnesses; the hearing panel's

decision was not supported by a preponderance of the evidence; the college prevented him from

investigating Smith's allegations or gathering evidence in his defense; and the college removed

relevant information from the final report, including information about the Oxford Program

bearing on Smith's credibility, and appended "[i]rrelevant and prejudicial documents" (DSOF ¶

156; Pl. Resp. ¶ 156; Def. Tab 31/Dkt. No. 38-33 at 3-8).  In addition, for the first time, Doe

claimed that Sandstrom's decision making was affected by a conflict of interest that she did not

disclose or remedy (DSOF ¶ 157; Pl. Resp. ¶ 157; Def. Tab 31/Dkt. No. 38-33 at 8-9).

     Haynes forwarded Doe's appeal to Sandstrom, the college's Title IX coordinator, and its

general counsel (PSOF ¶ 121; Def. Resp. ¶ 121).  Although Haynes did not ask for information,

Sandstrom sent Haynes the materials for the case that the panel had seen and background

information that Sandstrom considered relevant to the issues Doe raised on appeal (PSOF ¶¶ 121,

123; Def. Resp. ¶¶ 121, 123).  Sandstrom did not provide her comments to Doe and he did not

have an opportunity to reply to them (PSOF ¶ 123; Def. Resp. ¶ 123).

     Haynes denied Doe's appeal on October 9, 2017 (DSOF ¶ 166; Pl. Resp. ¶ 166; Def. Tab

32/Dkt. No. 38-34 at 2-5).  As to Doe's contention that he should have been informed of the

identities of Smith's witnesses and permitted to propose questions to them, Haynes wrote that "if

critical information [was] missing from the investigator's report, respondents and complainants

[could] respond . . . [by] request[ing] that the investigator speak with additional individuals and

[by] shar[ing] any thoughts about areas for follow up with witnesses" (Def. Tab 32/Dkt. No. 38-

34 at 3).  Haynes further stated that "[t]here is nothing in the college's policy that requires the

investigator to share witnesses' entire accounts with complainant or respondent" (PSOF ¶ 125;

Def. Resp. ¶ 125).

     K.    Post-suspension Campus Banner

     After Doe returned to Williams from his one-semester suspension, he complained to

Sandstrom about information that Smith had written on a campus banner that referred to the

panel's finding of sexual misconduct and Doe's return to the campus (DSOF ¶ 168; Pl. Resp. ¶

168; PSOF ¶ 127; Def. Resp. ¶ 127; Def. Tab 33).  Although the banner did not include Doe's

name, he viewed Smith's comments as retaliation and a breach of confidentiality concerning the

sexual misconduct investigation (DSOF ¶ 169; Pl. Resp. ¶ 169; PSOF ¶ 127; Def. Resp. ¶ 127).

Sandstrom referred Doe to Camacho, the Title IX coordinator (DSOF ¶¶ 170, 171; Pl. Resp. ¶¶

170, 171; PSOF ¶ 127; Def. Resp. ¶ 127).  Doe alleged that Camacho refused to take any action

about the banner, told him that Smith could "say what she wanted," and referred to the "MeToo

movement" (PSOF ¶ 128; Def. Resp. ¶ 128).  According to Doe, Camacho failed to inform him

that he could file a formal complaint against Smith and did not offer any support (PSOF ¶¶ 128,

129; Def. Resp. ¶¶ 128, 129).  Doe renewed the no contact order against Smith in September

2018 at the college's suggestion (DSOF ¶ 176; Pl Resp. ¶ 176).

### III.   LEGAL STANDARD

The purpose of summary judgment is "'to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"  *Garside v. Osco Drug, Inc.*, 895 F.2d 46,

50 (1st Cir. 1990) (citation omitted).  "Summary judgment is appropriate when, based on the

pleadings, discovery, and disclosure materials in the record, 'there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law.'"  *Ruggiero v. Am.*

*United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015) (quoting Fed. R. Civ. P. 56(a),

(c)).  "A 'genuine' dispute is one that, based on the supporting evidence, 'a reasonable [fact

finder] could resolve . . . in favor of the nonmoving party,' and a 'material' fact is one that has 'the

potential to affect the outcome of the suit under the applicable law.'"  *Id.* at 111-12 (quoting

*Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted)).

When reviewing a motion for summary judgment, the court views the facts "in the light

most favorable to the non-moving party." *Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122,

125 (1st Cir. 1999).  "If the moving party satisfies the burden of showing, based on evidentiary

material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party

to demonstrate by reference to specific provable facts 'that a reasonable jury could return a

verdict for the nonmoving party.'"  *Ruggiero,* 137 F. Supp. 3d at 112 (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986).  "[C]onclusory allegations, improbable inferences, and unsupported speculation" are

insufficient to establish a genuine dispute of material fact.  *Medina–Munoz v. R.J. Reynolds*

*Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

IV.    ANALYSIS

A.    Count I:  Breach of Contract

Doe alleges that Williams failed to meet his reasonable expectations based on the terms

of the Code of Conduct and the Process and by denying him basic fairness.  The parties treat the

Code of Conduct and the Process as a contract between Doe and Williams and agree that

Massachusetts law applies, and so does the court.  *See Sonoiki v. Harvard Coll.*, 37 F.4th 691,

703 (1st Cir. 2022); *Doe v. Trs. of Boston Coll.* (*BC I),* 892 F.3d 67, 80 n.4, 89 (1st Cir. 2018).

1.  Reasonable Expectations

"When a case involves breach of contract claims between a student and a private

academic institution, . . . court[s], following Massachusetts' lead, approach[] the claims by

examining 'the terms of the contract established between the college and the student and ask[ing]

whether the reasonable expectations of the parties have been met.'"  *Sonoiki*, 37 F.4th at 704

(third alteration in original) (quoting *Doe v. Trs. of Boston Coll.* (*BC II*), 942 F.3d 527, 533 (1st

Cir. 2019)).  "When applying this test, the court queries what the school 'should reasonably

expect' the student to understand from the language of the contract."  *Id.* (citing *BC I*, 892 F.3d at

80).

> In claims involving contract breaches based on purported faulty student disciplinary proceedings, [courts] compare the procedures used to adjudicate the disciplinary complaint with the language of the contract spelling out those procedures to determine whether, given the student's reasonable expectations, there was a gap between what the school promised and what the school delivered.

*Id.* (citing *BC I*, 892 F.3d at 80). "'If the facts show that the university has "failed to meet the student's reasonable expectations[,]" the university has committed a breach.'" *Id.* (alteration in original) (quoting *BC I,* 892 F.3d at 80).

Doe claims that Williams failed to meet his reasonable expectations under the parties' agreement because Williams: (a) failed to apply the correct definition of consent; (b) failed to afford him timely notice of the specific allegations against him; (c) denied him the opportunity to investigate the allegations against him; (d) precluded him from suggesting questions for witnesses; (e) failed to interview a witness whom he identified; (f) made inconsistent and unfair decisions concerning the documents and information that the hearing panel received; (g) denied him a fair appeal; and (h) appointed biased decisionmakers (Dkt. No. 46 at 3-16).

### a.  Applicable definition of consent

Generally, the academic institution should apply the version of the code of conduct in effect for the academic year in which the alleged misconduct occurs. *See Coveney v. President & Trs. of the Coll. of the Holy Cross,* 445 N.E.2d 136, 140 (Mass. 1983). Williams contends that, under that standard, the hearing panel correctly applied the 2016-2017 definition of consent. Williams points out that Doe had notice of that definition and testified at his deposition that he did not recall seeing the Code of Conduct, including the definition of consent, in the 2016-2017 Clery Report (Dkt. No. 51 at 1-4). For his part, Doe argues that the Clery Report definition of consent was communicated to him about a month before his encounter with Smith in November 2016 and should have applied in his case (Dkt. No. 46 at 5-6).

Under Massachusetts law, "[a] court interpreting a contract must first assess whether the contract is ambiguous." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011) (citing *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008)).  It is undisputed that the college's definition of consent was amended during the 2015-2016 academic year "to further elucidate that [Williams] had an affirmative consent policy" (Pl. Tab 81/Dkt. No. 51-1 at 50). The change was communicated to the college community: the amended definition of consent was posted on the college's website in April 2016 while Doe was a student (Pl. Tab 42/Dkt. No. 46-6 at 133; Pl. Tab 43/Dkt. No. 46-7 at 17; Pl. Tab 66/Dkt. No. 46-30 at 2).  The 2016-2017 Clery Report, however, which was distributed to the entire college community in October 2016, included the definition of consent that was in effect prior to the amendment (PSOF ¶¶ 19, 20; Def. Resp. ¶¶ 19, 20; Pl. Tab 43/Dkt. No. 46-7 at 17).  The e-mail by which the 2016-2017 Clery Report was distributed to the college community compounded the confusion, instructing that "[a]ll students should be familiar with the policies and Code of Conduct regarding sexual misconduct, as posted on the website of the Dean of the College [where the amended definition of consent was posted] and copied here [where the pre-amendment definition of consent was published]" (PSOF ¶ 18; Def. Resp. ¶ 18).  It is undisputed that Williams applied the 2016-2017 amended definition of consent to Doe's case (Def. Tab 8/Dkt. No. 38-10 at 8); that the investigator's final report recited the 2016-2017 amended definition of consent (Pl Tab 45/Dkt. No. 49 at 4); and that the hearing panel found that Doe did not have Smith's "affirmative consent for the intimate kissing and touching that occurred on January 11th" (Def. Tab 29/Dkt. No. 38-31 at 3-5).  Doe's claim that this error on Williams' part gave rise to an ambiguity about the definition of consent that was in effect at the relevant time is not frivolous.

Generally, "the meaning of an ambiguous contract term is a question of fact . . . [which] becomes a matter for the factfinder." *Farmers Ins. Exch.*, 632 F.3d at 783.  This is so unless the "'evidence . . . about the parties' intended meaning is so one-sided'" that there can be no reasonable dispute about the meaning of the allegedly ambiguous term.  *Id.* (quoting *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998)); *see also Sonoiki*, 37 F.4th at 711 (the language is ambiguous "where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken") (citing *Suffolk Constr. Co. v. Lancold Scaffolding Co.*, 716 N.E.2d 130, 133 (Mass. App. Ct. 1990)).  Thus, if a student's reasonable understanding of the pre-amendment definition of consent would not, in the relevant circumstances, have differed materially from the definition of consent applied by Williams, there would be no breach of contract.  *See Sonoiki,* 37 F.4th at 703-04; *Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 118-19 (D. Mass. 2021); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 334 (D.R.I. 2016) ("The critical question is what a reasonable student would expect the definition of consent to be under [the pre-amendment definition].").

The court finds that the 2016-2017 amended definition of consent did not "materially alter[]" the definition of the term as it appeared in the Clery Report.  *Brown Univ.,* 210 F. Supp. 3d at 335.  *See Williams Coll.,* 530 F. Supp. 3d at 118-19.  Although the pre-amendment definition of consent did not use the term "affirmative consent," it unambiguously provided that a student would be subject to discipline if he or she did not ask for and obtain the other party's express consent before engaging in sexual activity.  The pre-amendment definition required "consent for all sexual activity . . . at the time of the sexual contact."  In terms of ascertaining consent, the amended definition provided that "consent . . . means words and conduct indicat[ing] freely given approval or agreement, without coercion, by all participants in the

25

sexual contact."  The pre-amendment definition stated that "words or conduct" are sufficient to indicate valid consent to sexual activity by "both participants in the sexual contact," and that "[b]oth parties have the obligation to communicate consent or the lack of consent.  A verbal 'no' (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent." The amended definition replaced that language with "[c]onsent may not be inferred from silence or passivity."

The court in *Williams College* addressed a breach of contract argument virtually identical to Doe's and found that the college did not violate its contract with the plaintiff.  *See id.*  In the *Williams College* case, the Code of Conduct's definition of consent in effect was the definition of consent published in the 2016-2017 Clery Report.  *See id.* at 111.  As in this case, the hearing panel applied an amended definition that required affirmative consent and found that the plaintiff did not have the complainant's affirmative consent for sexual intercourse.  *See id.* at 111, 118. After comparing the two definitions, the court found that although the hearing panel applied the amended definition, the earlier definition "was sufficiently clear that the [c]ollege could reasonably expect all students to understand that a failure to ask for and obtain consent before initiating sexual intercourse violated the Code of Conduct."  *Id.* at 118-19.  Here, too, the college would reasonably expect Doe to understand that the definition of consent in the Cleary Report required him to ask for and obtain Smith's freely given consent before he initiated sexual activities.  *See Sonoiki,* 37 F.4th at 704.  *Compare Brown Univ.,* 210 F. Supp. 3d at 335-36 (finding a breach of contract where the hearing panel applied a "materially" different definition of consent that the plaintiff proved by a preponderance of the evidence influenced the outcome of the proceeding).

Pointing to the hearing panel's finding that Doe "may not have intended to contact [Smith] in an unwelcome manner, but consent needs to be explicitly given and that responsibility rests on the initiator" (Def. Tab 26/Dkt. No. 38-28 at 2), Doe contends that the hearing panel's decision was likely affected by the panel's failure to rely on the definition of consent that required both parties to communicate consent or the lack thereof (Def. Tab 26/Dkt. No. 38-28 at 2; Dkt. No. 46 at 5). *See Sonoiki,* 37 F.4th at 704 (a contradiction between two contractual terms can lead to ambiguity that cannot be resolved at the motion to dismiss stage). The college could expect a student reading the Clery Report's definition of consent to understand that each party was responsible for obtaining the other party's consent before initiating sexual activity. *See Fishman v. LaSalle Nat'l Bank*, 6 F. App'x 52, 55 (1st Cir. 2001) (unpublished) ("Common sense is as much a part of contract interpretation [in Massachusetts] as is the dictionary or the arsenal of canons.") (citing *Fleet Nat'l Bank v. H & D Entm't, Inc.,* 96 F.3d 532, 538 (1st Cir. 1996)). Because in both parties' version of events, Doe initiated the sexual activity with Smith, the panel's finding that, in the case before it, the initiator – Doe – was responsible for obtaining the other party's consent was consistent with the Clery Report's definition (Dkt. No. 46 at 5).

Moreover, Doe's defense to Smith's accusations during the proceedings reflected his understanding that he was required to obtain consent from Smith before engaging in sexual activity. He contended that he requested and obtained Smith's affirmative consent before he initiated each step in the sexual contact they had in January 2017 (Def. Tab 11 at WC-004086 to WC-004089 [Doe's January 18, 2017, letter to Bossong]; Pl. Tab 45/Dkt. No. 49 at 9-12, 13-14, 17-18, 30-32). Smith, in contrast, indicated that she never said "yes" and expressed a clear "no" to several of Doe's sexual overtures over the course of the January 2017 encounter (Def. Tab

29/Dkt. No. 38-31 at 4; Pl. Tab 45/Dkt. No. 49 at 31-32).  Williams did not breach its contract

with Doe when the panel, relying on the amended definition of consent, found Doe responsible

for sexual misconduct.

> **b.    Doe received timely and adequate notice of Smith's allegations.**

Doe argues that Williams breached the contract provision that obligated the college to

inform him of the specific factual conduct alleged to have given rise to the charge and violated

the Clery Act's regulations by failing to notify him of the specific allegations against him until he

received the final version of Kurker's report (Dkt. No. 46 at 6-7).  Doe's contention is not

supported by the record.

The Process was silent as to Williams' obligation to provide notice of the facts supporting

a charge to the respondent.  In *Sonoiki*, the First Circuit held that "a student's expectation can be

reasonable even if the precise expectation is not stated explicitly in the contract's language but,

instead, when the student's expectation, viewed objectively alongside the express terms of the

contract, is based on the student's fair interpretation of the contract's provisions."  *Sonoiki*, 37

F.4th at 709.  The Process provided that the complainant and respondent would have the

opportunity to respond to the investigator's final report before the report was submitted to the

panel (DSOF ¶ 15; Pl. Resp. ¶ 15; PSOF ¶ 26; Def. Resp. ¶ 26).  It would be reasonable,

therefore, for Doe to expect that he would receive notice of Smith's allegations before the hearing

panel deliberated.  The record shows that this expectation was satisfied.

Although Sandstrom's April 10, 2017, letter to Doe did not detail Smith's allegations

about Doe's behavior in November 2016 and January 2017, Doe learned the specifics of Smith's

account of their encounters during his interviews with Kurker and responded – in detail – to

Smith's version of events.  Kurker interviewed Smith before she interviewed Doe (Pl. Tab

45/Dkt. No. 49 at 2).  During Doe's first interview, Kurker read Doe portions of the transcript of Smith's interview, which included details about Smith's allegations (Pl. Tab 46/Dkt. No. 49-1 at 28-39).  Doe responded to Smith's description of each interaction (Pl. Tab 46/Dkt. No. 49-1 at 28-39).  Kurker re-interviewed Smith after Doe's first interview (Pl. Tab 45/Dkt. No. 49 at 2). During Doe's second interview, Kurker shared Smith's responses to Doe's accounts of their interactions and the new information that Smith provided during her second interview and again gave Doe the opportunity to respond (Pl. Tab 46/Dkt. No. 49-1 at 41-56).  In addition, Kurker's July 5 and July 25, 2017, draft reports included explicit details of Smith's version of her encounters with Doe and of the witness statements.  Doe responded to both drafts (Def. Tabs 16, 17, 21, 22).

Doe may be contending that he should have been told about the details of Smith's allegations *before* he met with the investigator, not *when* he met with her, so that he could better prepare his responses.  Where the parties' agreement did not entitle him to this order of investigation and Massachusetts law did not require it, s*ee Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000), Doe could not reasonably expect that the Process would play out that way.  Doe has not shown a genuine dispute of a material fact as to whether Williams met reasonable expectations as to the notice he received of Smith's allegations.[9]

---

[9] Although the Clery Act's regulations required the college's disciplinary procedure to "[p]rovide[]the accuser, the accused, and appropriate officials [timely and equal access to] any information that will be used during informal and formal disciplinary meetings and hearings, 34 C.F.R. § 668.46 (k)(3)(B)(3), "the Clery Act, 20 U.S.C. § 1092, . . . does not provide a private cause of action to individuals against schools for violations of the act." *Souders v. Mount St. Joseph Univ.*, Case No. 1:15-CV-429, 2016 WL 2935663, at *1 (S.D. Ohio May 20, 2016) (citing 20 U.S.C. § 1092(f)(14)(A)(i) ("Nothing in this subsection may be construed to . . . create a cause of action against any institution of higher education or any employee of such an institution for any civil liability[.]").  In any event, Williams' Process complied with this directive, which is not specific as to the timing of the required disclosures.

       **c.**     **Williams met Doe's reasonable expectations as to investigation of Smith's allegations.**

Doe has not pointed to any explicit promise by Williams in support of his claim that he reasonably expected that he would be permitted to conduct an independent investigation as part of the disciplinary process, nor does he point to any basis for the court to find that Williams made such a promise implicitly (Dkt. No. 46 at 7). The college's confidentiality policy, which applied to respondents in sexual misconduct cases, prohibited all parties involved in a disciplinary investigation by the college from discussing the case or sharing materials with anyone, including potential witnesses (DSOF ¶¶ 23, 24; Pl. Resp. ¶¶ 23, 24; Def. Tab 9/Dkt. No. 38-11 at 2). The Process provided for a respondent to identify witnesses to the investigator (Def. Tab 9/Dkt. No. 38-11 at 2). Doe identified four witnesses for Kurker to interview (Def. Tab 2/Dkt. No. 38-4 at 129-30; Pl. Tab 46/Dkt. No. 49-1 at 38, 39, 67). Kurker interviewed three of the four; the fourth did not appear for the scheduled interview. At no point did Doe identify any other potential witness.

Doe's reliance on *Doe v. Marymount Univ.,* 297 F. Supp. 3d 573 (E.D. Va. 2018) is unavailing. In Virginia, a university's "student conduct policies are not contracts." *Id.* at 587. Assuming without deciding that there might be some implied contract between the suspended student and Marymount, the court rejected the student's "attempt[] to erect a veritable procedural fortress around him[self]" "by importing a host of implied contractual terms" and held that Marymount did not violate any implied contractual duty to him. *Id.* at 588. With no support for this aspect of Doe's breach of contract claim, Williams is entitled to summary judgment on so much of the complaint as alleges that Williams failed to comply with its contractual obligations when it instructed Doe to refrain from conducting an independent investigation of Smith's allegations.

        **d.**     **Williams gave Doe the opportunity to suggest questions for witnesses in compliance with the terms of the Process.**

Williams' disciplinary Process stated, "The complainant and respondent may each suggest questions to the investigator to be asked of others, and may also suggest others that the investigator speak with" (Pl. Tab 43/Dkt. No. 46-7 at 30).  While the Process did not specify when a respondent would be expected to submit questions for witnesses to the investigator, a student could reasonably expect that he or she would have that opportunity before the investigator issued her final report.  *See Sonoiki,* 37 F.4th at 709.  Williams delivered on that promise.

Doe's contention here appears to be that he could not effectively formulate questions for Smith's witnesses without being informed of their identities and the information they provided (Dkt. No. 46 at 7-8).  It is undisputed that Doe received that information.  Sandstrom e-mailed Doe a draft of the investigator's report that identified Smith's witnesses and described the information they had given to the investigator in detail (DSOF ¶ 78; Pl. Resp. ¶ 78).  Sandstrom's cover e-mail informed Doe of his right to send her additional questions that he believed should be asked before the report was finalized and submitted to the hearing panel (DSOF ¶ 78; Pl. Resp. ¶ 78; Def. Tab 15 at WC-004487).  To the extent the provision in the Process giving a respondent the right to propose questions for witnesses gave rise to a reasonable expectation that Doe would be informed about the identities of witnesses and what they had said, the college satisfied that expectation.  No more was required.  *See BC I*, 892 F.3d at 80-81 (finding no breach of contract after comparing the language of the college's policy and the student's reasonable expectations based on the policy).  *Compare Sonoiki,* 37 F.4th at 711-12 (the plaintiff adequately alleged a breach of contract where "the student's Board Rep is to inform them about

what each witness says during the interviews and share any information that comes to light from the interviews" and this provision was not satisfied).

> e.  **The college did not violate its agreement with Doe when his fourth witness failed to appear for an interview.**

Doe identified two witnesses who were together when he spoke with them on January 17, 2017, immediately after Smith demanded that he resign his position as a leader of the international student organization (PSOF ¶¶ 5, 6; Def. Resp. ¶¶ 5, 6; Pl. Tab 46/Dkt. No. 49-1 at 23-24).  Kurker interviewed one of the witnesses (Witness 1) (Pl. Tab 45/Dkt. No. 49 at 2).  On Monday, May 1, 2017, Sandstrom's executive assistant contacted the other witness (Witness 2) who agreed to speak to Kurker (Pl. Tab 80/Dkt. No. 46-43 at 2).  Kurker scheduled an interview with Witness 2 for Monday, May 8, 2017, but cancelled it on May 7 (Pl. Tab 77/Dkt. No. 46-40 at 2-3).  Kurker and Witness 2 rescheduled the interview for Tuesday, May 9, 2017, at 9:30 A.M. (Pl. Tab 77/Dkt. No. 46-40 at 2-3).  When Witness 2 did not respond to Kurker's call at 9:30 A.M. on Tuesday, Kurker left Witness 2 a voicemail (Pl. Tab 78/Dkt. No. 46-41 at 2).  On Wednesday, May 10, 2017, Kurker e-mailed the witness and asked to reschedule the interview (Pl. Tab 79/Dkt. No. 46-42 at 2).  On May 18, 2017, Kurker asked Sandstrom to contact Witness 2 after the witness failed to respond to Kurker's voicemail and e-mail messages (Pl. Tab 78/Dkt. No. 46-41 at 2).  Kurker's report indicated that Witness 2 did not respond to requests to interview her (Pl. Tab 45/Dkt. No. 49 at 3).  Doe now contends that the college violated the parties' contract by failing to interview Witness 2.

The confidentiality policy indicated that Sandstrom would contact the witnesses that Doe identified (Def. Tab 9/Dkt. No. 38-11 at 2).  Kurker and Sandstrom complied with that provision by repeatedly reaching out to Witness 2.  Williams had no ability to compel Witness 2 to speak with Kurker.  Doe could not reasonably interpret the policy to require more than Sandstrom and

Kurker did when Witness 2 failed to appear or respond  (Pl. Tab 80/Dkt. No. 46-43 at 2).  *See BC I,* 892 F.3d at 80-81.

Moreover, Doe has not shown that Witness 2's information would not have been cumulative of Witness 1's report of that meeting.  Witness 2 was not present during Doe's encounters with Smith in November 2016 and January 2017 (PSOF ¶¶ 1, 4; Def. Resp. ¶¶ 1, 4).  According to Doe and Witness 1, Doe did not give Witnesses 1 and 2 details of his encounters with Smith (Pl. Tab 45/Dkt. No. 49 at 24; Pl. Tab 46/Dkt. No. 49-1 at 39).  As a result, Doe has not shown that Witness 2's information would have changed the outcome of the proceeding.  *See Brown Univ.,* 210 F. Supp. 3d at 335-36; *see also Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 726 (1st Cir. 1983) ("Failure of the university to produce the witnesses requested by Cloud, whose relevance and importance are far from obvious, did not violate the fairness standard of *Coveney*.").  Williams is entitled to summary judgement on this aspect of Doe's breach of contract claim.

> f.  **Sandstrom's decisions about the information provided to the hearing panel were in compliance with the parties' agreement.**

Doe contends that "Williams breached its contract by withholding [exculpatory information] from the panel, which could have altered its view of Smith's credibility" by removing text messages between Witness B and Doe's former girlfriend ("former Exhibit N"), and all references to the Oxford Program in exhibits to Kurker's final report (Dkt. No. 46 at 10-11).  The Process directed Sandstrom to "ensure that the report [did] not contain material that [was] inadmissible in the decision process, such as irrelevant prior sexual history" (Pl. Tab 43/Dkt. No. 46-7 at 30).  Sandstrom excluded the January 25, 2017, messages between Witness B and Doe's former girlfriend because they did not contain first-hand information about interactions between Doe and Smith and because she deemed that they contained inadmissible

character evidence, speculation about what had occurred, and Doe's report to Witness B, which was cumulative of information included in the report (Def. Tab 15 at WC-004605 to WC-004612; Def. Tab 38/Dkt. No. 38-40 ¶ 3; DSOF ¶ 86; Pl. Resp. ¶ 86; PSOF ¶ 56; Def. Resp. ¶ 56).[10]  Doe points out that Sandstrom did not remove Witness A's notes of her interactions with Smith from January 11 to January 20, 2017 (Exhibit K), messages between Witness A and Witness B ("new Exhibit N"), and a text message from one of Smith's witnesses to the witness' friend ("new Exhibit Q").  In contrast to former Exhibit N, however, Exhibit K, new Exhibit N, and new Exhibit Q recounted the witnesses' observations of Smith or conversations with her in which she gave details of her encounter with Doe close in time to the event (DSOF ¶ 86; Pl. Resp. ¶ 86; PSOF ¶ 56; Def. Resp. ¶ 56); Def. Tab 22 at WC-004108 to WC-004113, at WC-004144, at WC-004146 to WC-004158).  Sandstrom could reasonably conclude that evidence of first-hand observations of Smith's demeanor, appearance, and statements, close in time to the events at issue, was important evidence for the hearing panel.  Doe has not persuasively explained why Sandstrom's evidentiary decisions were not well within the discretion the Process afforded to her about the evidence to be submitted to the hearing panel.

Doe claims that, in excluding all references to his selection to participate in the Oxford Program and the effect of this selection on Smith, Sandstrom excluded evidence that had significant exculpatory value.  According to Doe, Smith made inconsistent statements about whether his acceptance into the Oxford Program motivated her to file a complaint, and this inconsistency might have affected the hearing panel's assessment of her credibility (Dkt. No. 46 at 10-11).  Sandstrom found that this proposed evidence "contain[ed] additional information that

---

[10] Sandstrom agreed with Doe that Kurker's report should include the part of former Exhibit N that indicated that Witness A was pushing Smith to use the term "sexual assault" (Pl. Tab 50/Dkt. No. 46-14 at 3-4).

could be prejudicial to [Doe] and is not allowable in the material presented to the panel" (Pl. Tab 50/Dkt. No. 46-14 at 4).  There was evidence that some of Smith's witnesses believed that Doe's acceptance into the Oxford Program prompted her formal complaint (DSOF ¶ 89; Pl. Resp. ¶ 89).  Smith denied that Doe's acceptance into the program motivated her (DSOF ¶¶ 89, 90; Pl. Resp. ¶¶ 89, 90; PSOF ¶ 60; Def. Resp. ¶ 60).  Instead, according to Smith, she felt compelled to file a formal complaint after another female student who was also attending the Oxford Program confided to Smith that she too had been a victim of sexual misconduct by Doe (DSOF ¶ 90; Pl. Resp. ¶ 90).  Thus, Sandstrom concluded, if she included statements about Smith's motive for making the complaint against Doe but excluded Smith's statement about the other female student, the hearing panel would not have a complete picture about Smith's reasons for filing the complaint when she did.

Information that Doe's acceptance into the Oxford Program motivated Smith to file a formal complaint undermined her credibility only if her explanation of her motivation was excluded from the evidence.  A student could not reasonably expect that the college would present the hearing panel with incomplete and arguably misleading evidence (Pl. Tab 43/Dkt. No. 46-7 at 30).  Even without that evidence, Doe's written response to Kurker's report pointed to a substantial amount of evidence that, he alleged, undermined Smith's credibility and the hearing panel had his response before them (Def. Tab 17).  Moreover, the evidence of Smith's contradictory statements about her motivation in bringing the complaint did not bear on the central question of the credibility of her account of her interactions with Doe, and the allegedly contradictory evidence about motive was not as clear as Doe seems to suggest, nor would it carry the weight Doe seeks to assign to it.  Smith told her friends, her dorm advisor, and Sandstrom about her encounters with Doe some three months before she filed her formal complaint (Pl. Tab

45/Dkt. No. 49 at 20-29; Def. Tab 16 at WC 005511).  She demanded that he resign his position

with the international student organization almost immediately after their January 11, 2017

encounter, and told Sandstrom, on or around January 25, 2017, what she said had happened but

that she preferred not to move forward with a disciplinary process at that time and wanted to

consider her options and the best path forward (PSOF ¶ 5; Def. Resp. ¶ 5; Pl. Tab 45/Dkt. No. 49

at 8-9; Def. Tab 16 at WC 005511).  To the extent Smith's account of her interactions with Doe

changed between January 2017 and April 2017, when she initiated the college's formal

disciplinary process, the hearing panel had that information in Kurker's report.

   The decisions Sandstrom made about evidence submitted to the hearing panel were

consistent with what a student might reasonably expect and were not in breach of the parties'

agreement.

### g.   Sandstrom did not interfere with Doe's appeal.

   Doe claims that the Process did not permit Sandstrom to submit what he characterizes as

a rebuttal to his appeal to Haynes (Dkt. No. 46 at 11-12).  Williams argues the Process did not

preclude Sandstrom from providing Haynes with neutral background information that did not

advocate for an affirmance of the hearing panel's decision (Dkt. No. 51 at 9-13).

   "[I]f the university explicitly promises an appeal process in disciplinary matters, that

process must be carried out in line with the student's reasonable expectations."  *Havlik v.

Johnson & Wales Univ.,* 509 F.3d 25, 34-35 (1st Cir. 2007) (citing *Cloud,* 720 F.2d at 724-25).

The Process gave the accuser and the accused the right to appeal the outcome of the disciplinary

process and provided that a student's grounds for an appeal were limited to "significant

procedural lapses" or the discovery of "substantive new evidence" (Pl. Tab 43/Dkt. No. 46-7 at

30).  The appeals officer was directed to grant an appeal only if either the procedural lapses or

the new evidence was "substantive enough to have significantly affected the outcome of the initial hearing" (Pl. Tab 43/Dkt. No. 46-7 at 31).  The Process was silent as to the procedure the appeals officer should follow and the material the appeals officer could review (Pl. Tab 43/Dkt. No. 46-7 at 30-31).  If the complainant or the respondent wished to have any additional witnesses interviewed in connection with the appeal, the student was directed to write to the Dean of the College (Sandstrom), who would take it from there (Pl. Tab 43/Dkt. No. 46-7 at 31).

Doe's appeal set forth seven alleged procedural errors during the investigation (Def. Tab 31/Dkt. No. 38-33 at 3-8).  After Haynes received Doe's appeal, she sent it to Sandstrom, Camacho, and the college's general counsel (PSOF ¶ 121; Def. Resp. ¶ 121).  Although Haynes did not ask for a response, Sandstrom provided Haynes with the material that was before the hearing panel and a document entitled "Background relevant to [Doe's] appeal" (PSOF ¶ 123; Def. Resp. ¶ 123; Pl. Tab 64/Dkt. No. 49-7 at 2-3).  That document was not shared with Doe (PSOF ¶ 123; Def. Resp. ¶ 123).

Doe contends that Sandstrom violated the parties' agreement because Haynes was improperly influenced by the background information she received from Sandstrom.[11]  The First Circuit's decision in *Havlik* is instructive in resolving this claim.  There, as in the instant case, the student handbook was "silent as to the kinds of materials that an appeal officer may review." *Havlik,* 509 F.3d at 35.  The *Havlik* plaintiff argued "'that the University breached its implied

---

[11] Doe selectively quotes portions of an e-mail message from Sandstrom to Smith's faculty advisor in support of his argument that Sandstrom was "anxious that the appeal be denied" (Dkt. No. 46 at 12).  The pertinent portion of Sandstrom's message to Smith's adviser explained that if the college failed to comply with the policy that permitted additions to the investigative report, the college "would be laying [itself] open to an appeal" based on a significant procedural defect. While Sandstrom was sympathetic to the report of the toll the process had taken on Smith, she also characterized Doe's requests as reasonable and in keeping with the college's policy (Pl. Tab 69/Dkt. No. 46-33 at 2).

duty of good faith and fair dealing because the appeal officer . . . was improperly influenced by the phraseology of [a] crime alert [naming the plaintiff] and her conversation with . . . [the University's vice-president for student affairs].'" *Brown Univ.,* 210 F. Supp. 3d at 344 (alterations in original) (quoting *Havlik,* 509 F.3d at 35). The court found that "[g]iven the sketchy nature of the appeal provision in the handbook and the straightforward nature of the materials that were made available to [the appeals officer] . . . , it seems entirely reasonable for her to have considered that information." *Havlik,* 509 F.3d at 35. In addition, the plaintiff presented no evidence that the University's vice-president for student affairs conveyed his negative impression of the plaintiff to the appeals officer. *See id.* In allowing summary judgment in favor of the university, the court concluded, "[i]n the absence of any probative evidence that the appeal officer ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures limned in the handbook, or made her decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted." *Id.* at 36.

The court's reasoning compels the same result here. The Process did not limit the type of material Haynes could review. Like the information the appeals officer in *Havlik* considered, the background material that Sandstrom submitted to Haynes was factual and unbiased. *See id.* at 35. In addition to stating the college's policy and procedure that permitted students to access potential witnesses through the Dean of the College, the background material included Sandstrom's e-mail correspondence with Doe addressing his opportunity to question witnesses and the reasons that certain exhibits or information were excluded from or included in Kurker's final report (Pl. Tab 64/Dkt. No. 49-7 at 2-3). Sandstrom also explained her alleged familial relationship with Doe (Pl. Tab 64/Dkt. No. 49-7 at 2-3). Doe does not challenge the accuracy of

the information Sandstrom provided to Haynes and has not identified the content that he asserts "urg[es] affirmance" of the hearing panel's decision (Dkt. No. 46 at 12). *Compare BC I,* 892 F.3d at 86 (denying summary judgment where there was a genuine question of material fact concerning whether the college acted in breach of the plaintiff's reasonable expectations when a college administrator interfered with a hearing board's deliberations by telling the board chair that the Dean of Students discouraged a "no finding" verdict, which would have been favorable to the plaintiff); *Williams Coll.,* 530 F. Supp. 3d at 122-23 (denying summary judgment where there was evidence that the Dean of the College reversed the hearing panel's decision on an allegation of misconduct by the female complainant).

The case upon which Doe relies, *Doe v. Grinnell Coll.,* 473 F. Supp. 3d 909 (S.D. Iowa 2019), is distinguishable (Dkt. No. 46 at 12). There, the appeals officer offered the decisionmaker, who had found the student responsible for misconduct, the opportunity to respond to the student's appeal. *See id.* at 921-22, 924. The adjudicator addressed each of the student's arguments and provided additional support for her finding of responsibility. *See id.* at 922, 924. Where the college's policy required the appeals officer to be an "'impartial decision-maker' without any actual bias or conflict of interest," the court found that the extent of the adjudicator's participation in the student's appeal created a genuine question of material fact concerning the fairness of the appeal. *Id.* at 924. In contrast, Sandstrom was not a member of the hearing panel that found Doe responsible for sexual misconduct and she did not advocate for affirming the hearing panel's decision.

The Process did not set out the steps by which Haynes was to obtain information she needed to adjudicate the appeal and did not limit or describe the information she would receive. "Where [the college's] policies are silent, [the college] may conduct proceedings in a way it sees

fit, so long as it does not act arbitrarily and capriciously." *Brown Univ.,* 210 F. Supp. 3d at 345. Because Haynes did not ignore "promised protections, improperly consult[] certain proof, act[] arbitrarily in carrying out the procedures limned in the handbook, or ma[k]e her decision in bad faith[,] there has been no showing that the plaintiff's reasonable expectations were thwarted." *Havlik,* 509 F.3d at 36.

> ### h.   Doe has not pointed to evidence that decisionmakers were biased against him.

Doe complains that the hearing panel and Sandstrom were biased against him and that this bias was a contractual breach.  As to the hearing panel, Doe argues that "the training materials . . . were gender biased and promoted a view of male students as violent predators" in violation of the college's guarantee of a fair and impartial proceeding (Dkt. No. 46 at 13).  "'[I]t has been noted that '[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'''" *BC I,* 892 F.3d at 84 (second alteration in original) (quoting *Gorman v. Univ. of R.I.,* 837 F.2d 7, 15 (1st Cir. 1988)).  Doe does not clear that hurdle. The testimony of the two hearing panel members who were deposed in April 2021 did not support Doe's claim that the content of the training materials biased the hearing panel members against male respondents (Def. Tab 5/Dkt. No. 38-7; Def. Tab 6/Dkt. No. 38-8).  *See Bleiler v. Coll. of the Holy Cross,* Civil Action No. 11-11541-DJC, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013) (there was no genuine factual dispute without evidence that the college dismissed the student as a result of the hearing panel's exposure to gender-biased training materials).  This court also finds persuasive the decision of another session of this court which rejected a similar claim concerning the training materials that are at issue in the instant case.  *See Williams Coll.,* 530 F. Supp. 3d at 116.

As to Sandstrom, there is "'a presumption [of impartiality] favor[ing] the administrators, and the burden is upon the party challenging that action to produce evidence sufficient to rebut this presumption.'" *BC I,* 892 F.3d at 84 (first alteration in original) (quoting *Gorman,* 837 F.2d at 15). Sandstrom's family connection to Doe was tenuous. Indeed, she had never heard of him before he came to Williams and introduced himself to her (DSOF ¶¶ 161, 162; Pl. Resp. ¶¶ 161, 162). Doe's argument that she might be motivated to avoid an accusation of bias is nothing more than speculation. That is insufficient.

Finally, the hearing panel's finding that Doe was not responsible for the November 19, 2016, encounter with Smith belies his claims of bias. *See Doe v. Cummins,* 662 F. App'x 437, 454 (6th Cir. 2016) (unpublished) (finding the plaintiff's claim of bias against male respondents unpersuasive where plaintiff was found "not responsible" as to the complainant's allegations). The facts on which Doe relies do not raise a genuine dispute as to bias on the part of Sandstrom or the decisionmakers.

### 2.    Basic Fairness

Doe argues that Williams did not comply with the college's promise to provide a fair proceeding by denying him a live hearing and the right to cross-examine or meaningfully test witness's testimony, notice of Smith's allegations at the beginning of the process, and the ability to appeal on the basis that the decision was incorrect or unsupported by the evidence (Dkt. No. 46 at 13-16).

"Both Massachusetts and First Circuit case law in this realm of school disciplinary proceedings show that although denial of basic fairness is a recognized theory of recovery, the precise contours of such a claim are yet to be clearly defined." *Sonoiki,* 37 F.4th at 714. While the First Circuit has "clearly recognized in Massachusetts law a denial of basic fairness claim as

distinct from a breach of contract claim, *see BC I,* 892, F.3d at 87," *id.* at 714, 715, "the denial of

basic fairness is closely intertwined with the breach of contract concept." *Id.* at 714.

> When [the court] evaluat[es] a student's claim that a private school's procedures
> for adjudicating a disciplinary complaint denied the student basic fairness, [the
> court] consider[s] "whether the procedures followed were 'conducted with basic
> fairness,'" *BC II,* 942 F.3d at 533 (quoting *Schaer,* 735 N.E.2d at 380), meaning
> that, at a minimum, the school complied with the express procedures laid out in
> the policies that formed the contract, *BC I,* 892 F.3d at 88.  In this way, fairness
> can in a sense be viewed as one of the reasonable expectations a student has about
> the disciplinary process.  Moreover, courts have acknowledged that a school's
> "independent duty to provide basic fairness" is rooted in "the implied covenant of
> good faith and fair dealings imposed on every contract by Massachusetts law."
> *BC I,* 892 F.3d at 87 [citation omitted] . . . At the end of the day, however, [the
> court] defers to "the choices of student discipline proceedings made by private
> academic institutions," *BC II,* 942 F.3d at 535, and adheres to the principle in
> Massachusetts law that courts are 'chary about interfering with academic and
> disciplinary decisions made by colleges and universities, *id.* (quoting *Schaer,* 735
> N.E.2d at 381) (cleaned up).

*Id.* at 714-15.

The college promised Doe a fair proceeding (Pl. Tab 43/Dkt. No. 46-7 at 29).  *See BC II,*

942 F.3d at 534 ("where the school's policies themselves state a requirement of basic fairness, a

failure to follow those policies could give rise to a claim.") (citing *BC I,* 892 F.3d at 88).

Williams is a private educational institution (DSOF ¶ 2; Pl. Resp. ¶ 2).  *See BC II,* 942 F.3d at

533-34.  "[T]he highest court of Massachusetts, the Supreme Judicial Court (SJC), has been

explicit that a private university need not comply with federal due process to meet the basic

fairness requirement in disciplining students."  *Id.* (citing *Coveney,* 445 N.E.2d at 138-40;

*Schaer,* 735 N.E.2d at 381).  *Compare Haidak v. Univ. of Mass.,* 933 F.3d 56, 65 (1st Cir. 2019)

(a public university is required to comply with the federal due process clause).

"In adjudicating [Doe's] case, the [college] employed a non-adversarial model of truth

seeking.  It was the [college's] responsibility, rather than the parties', to investigate the facts and

develop arguments for and against a finding of responsibility. . . . Such a system can fairly be

called inquisitorial." *Haidak*, 933 F.3d at 68 (citing *Inquisitorial System*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  An inquisitorial system is not inherently unfair.  *See id.*  The college complied with its promise of fairness as that promise has been defined by state and federal courts in this jurisdiction.  First, "[s]ince the disciplinary process set out in the [c]ollege's written policies did not include an opportunity for the hearing panel to hear live testimony [including a form of cross-examination], basic fairness did not require such a proceeding." *Williams Coll.,* 530 F. Supp. 3d at 120-21 (citing *BC II,* 942 F.3d at 533-34).  *See Doe v. Stonehill Coll., Inc.,* Civil No. 20-10468-LTS, 2021 WL 706228, at *14 (D. Mass. Feb. 23, 2021), *appeal docketed,* No. 21-1227 (1st Cir. Mar. 23, 2021) ("basic fairness under Massachusetts law does not entitle parties to a live hearing or cross-examination"); *Coveney,* 445 N.E.2d at 138-40 (holding that there was no denial of basic fairness where a student was denied a hearing before the judicial board prior to his expulsion because the college handbook did not entitle him to a judicial board hearing); *Driscoll v. Bd. of Trs. of Milton Acad.,* 873 N.E.2d 1177, 1182, 1187 (Mass. App. Ct. 2007) (holding that there was no denial of basic fairness where a student who had an opportunity to explain his behavior was expelled without giving him access to the evidence against him or an opportunity to question his accuser).

Second, as is set forth above, Kurker gave Doe notice of Smith's allegations when Kurker read portions of Smith's interview transcripts to him and he got more information when he reviewed Kurker's draft reports of July 5 and July 25, 2017 (Pl. Tab 46/Dkt. No. 49-1 at 28-39, 41-56; Def. Tabs 16, 17, 21, 22).  He has not shown that he was deprived of information in a way that interfered with his ability to defend himself against Smith's allegations.  In this regard too, the Process complied with the college's promise of fairness.  *See Sonoiki,* 37 F.4th at 714-15.

Doe further claims that Williams' promise of basic fairness was violated by its failure to give him the opportunity to appeal the hearing panel's decision on the grounds of an erroneous outcome (Dkt. No. 46 at 16).  "No Massachusetts court has previously ruled that basis fairness requires any right to an appeal, let along the type of broad appeal championed by Doe." *Williams Coll.,* 530 F. Supp. 3d at 121.  "Federal courts are not free to extend the reach of state law."  *BC II*, 942 F.3d at 535; *see also Sonoiki*, 37 F.4th at 714.[12]  At the end of the day, Doe "has not shown . . . how [his] allegations breached the promises of basic fairness in the contract." *Sonoiki,* 37 F.4th at 716.

In summary, Defendant is entitled to summary judgment on Count I.

B.      Count II:  Breach of the Covenant of Good Faith and Fair Dealing

Doe's claim that Williams breached the covenant of good faith and fair dealing duplicates his claim that he was denied basic fairness (Dkt. No. 37 at 16-17; Dkt. No. 46 at 4 n.2).  *See id.* Williams is entitled to summary judgment on Count II.

C.      Count III:  Violation of Title IX

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  To support his claim that gender was a motivating factor in Williams' decision to discipline him, Doe points to the college's training materials, Camacho's reference to the "MeToo" movement when Doe complained about Smith's post-hearing conduct, and actions of certain college administrators

---

[12] Doe also incorporates his other breach of contract claims as denying him basic fairness (Dkt. No. 46 at 16).  These contentions are rejected for the reasons discussed in connection with Doe's breach of contract claims.

(Dkt. No. 1 ¶ 140; Dkt. No. 46 at 16-20).  Williams contends that "Doe has failed to adduce any evidence that the outcome of the case was caused by gender bias" (Dkt. No. 51 at 15-19). Williams has the better argument.

> There is a circuit split on the analysis of Title IX claims.
>
> In *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), the Second Circuit set out two theories for Title IX claims of sex discrimination in university disciplinary proceedings:  (1) the "erroneous outcome" theory, under which the plaintiff claims to be "innocent and wrongly found to have committed an offense," and (2) the "selective enforcement" theory, under which the plaintiff claims that "the severity of the penalty and/or the decision to initiate the proceedings was affected by the student's gender."

*Bray v. Worcester Polytechnic Inst.*, CIV. ACT. NO. 21-40049-TSH, 2022 WL 952131, at *9 n.17 (D. Mass. Mar. 30, 2022).  Other circuit courts have asked whether "'the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?'"  *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021) (alteration in original) (quoting *Doe v. Purdue Univ.,* 928 F.3d 652, 667-68 (7th Cir. 2019)).  "The First Circuit has not found it necessary to address the proper framework for analyzing Title IX claims in the context of student disciplinary proceedings."  *Bray*, 2022 WL 952131, at *9 n.17 (citing *BC I,* 892 F.3d at 90).  Plaintiff advocates for the *Sheppard* approach.  Other sessions of this court have followed the Second Circuit's approach, *see Bray*, 2022 WL 952131, at *9 n.17; *Williams Coll.*, 530 F. Supp. 3d at 113; *Stonehill Coll., Inc.,* 2021 WL 706228, at *7; *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 60 (D. Mass. 2020), and, in *BC I*, the First Circuit assumed without deciding that the *Yusef* test applied.  *See BC I,* 892 F.3d at 90.  In this court's view, the *Yusef* inquiries capture the fundamental question under Title IX, which is whether Doe has identified evidence raising a plausible inference that he was treated differently because he is

male either in the outcome of his disciplinary hearing or in the college's response to concerns he raised about Smith's conduct when he returned to campus after his suspension.

        1.      Erroneous outcome because of gender bias

To show that the outcome of his disciplinary hearing was attributable to gender bias, Doe must "offer evidence 'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'"  *BC I,* 892 F.3d at 90 (alteration in original) (quoting *Yusuf,* 35 F.3d at 715).

        **a.**    **Doe has not shown any bias in the training materials that affected the outcome of his disciplinary hearing.**

Doe argues that three parts of the training materials "advanced a gender-biased view of male students as sexual predators" (Dkt. No. 46 at 18).  First, he points to three slides that addressed research about a so-called confluence model, which advanced the theory that impersonal sex and hostile masculinity could combine to produce sexual aggression (PSOF ¶ 83; Def. Resp. ¶ 83; Def. Tab 7/Dkt. No. 38-9 at 39).  Second, he identifies a video of a rapist, whose crimes were neither reported nor prosecuted, who took advantage of women who had been drinking (Pl. Tab 57; PSOF ¶ 86; Def. Resp. ¶ 86).  Third, he points to Bossong's use of an investigative report from a prior sexual assault case, in which she changed the respondent's name to Tom Riddle and the complainant's name to Olivia Benson (PSOF ¶ 91; Def. Resp. ¶ 91).  The two members of the hearing panel who were deposed in April 2021 did not recall details of the June 2016 training (Def. Tab 5/Dkt. No. 38-7 at 12-13, 16, 22-23, 25; Def. Tab 6/Dkt. No. 38-8 at 19-24).

Doe has not shown a "causal connection" between those training materials and the hearing panel's finding that Doe was responsible for sexual misconduct.  *BC I,* 892 F.3d at 91.  "Despite [Doe's] characterization of these [t]raining [m]aterials, there is no evidence that the

materials directed [p]anelists to assume the guilt of the accused or that [p]anelists did so."
*Bleiler,* 2013 WL 4714340, at *12.  Indeed, another session of this court rejected a similar
challenge to Williams' training materials, holding "[t]he extremely minimal use of the phrase
'hostile masculinity' [in the confluence model slides] . . . , without more, is insufficient evidence
that the training materials are tainted by anti-male gender bias."  *Williams Coll.,* 530 F. Supp. 3d
at 116.  As to the video involving the use of alcohol, there was no evidence of alcohol use in the
instant case.  As to the sample scenario, as far as Bossong could recall, some trainees viewing
this material found that the male was not responsible (PSOF ¶ 92; Def. Resp. ¶ 92; Pl. Tab
67/Dkt. No. 46-31 at 10-11).  In arguing unconscious bias engendered by the training materials,
Doe ignores that: (1) the hearing panel found that he was not responsible for sexual misconduct
during his November 2016 encounter with Smith, a finding that mitigates against anti-male bias
among hearing panel members; (2) Koralesky, one of the hearing panel members, demonstrated
a lack of bias against males by finding in favor of male students in two other sexual misconduct
cases; and (3) the training slides referred to the Code of Conduct in gender-neutral terms and
slides presenting the college's statistics showed that men and women could be victims of sexual
violence and used gender-neutral language (DSOF ¶ 112; Pl. Resp. ¶ 112; Def. Tab 7/Dkt. No.
38-9 at 13, 25, 35).  In the face of these undisputed facts, Doe's claims of gender bias on the
basis of the training materials fail.  *See Bleiler,* 2013 WL 4714340, at *12 (granting summary
judgment where there was no evidence to support the plaintiff's assertion that the training
exercises exposed the hearing panel to anti-male bias).  *Compare Doe v. Trs. of the Univ. of Pa.,*
270 F. Supp. 3d 799, 823-24 (E.D. Pa. 2017) (finding that the complaint, which alleged that the
university's training materials for employees who were involved in disciplinary proceedings

"encourage[d] the employees to believe the accuser and presume the accused's guilt," was sufficient to survive a motion to dismiss).

> ### b. Doe has not shown evidence of gender bias by university administrators that affected the outcome of the proceedings.

Doe claims gender bias on the part of Sandstrom, pointing to the letter she drafted explaining the hearing panel's findings, and Camacho, pointing to her reference to MeToo and her failure to assist or direct Doe to assistance when Doe complained to her about Smith's alleged violation of the college's confidentiality policy by her contribution to a banner displayed on campus (Dkt. No. 46 at 18-19). The draft letter Sandstrom sent to the panel members stating their findings and explaining their reasoning, with revisions suggested by the panel members, was separately adopted as an accurate reflection of the hearing panel's reasoning by each of its members (DSOF ¶148; Pl. Resp. ¶ 148). For its finding of sexual misconduct, the panel members relied to a significant extent on Doe's statement to Bossong, in which Doe acknowledged discomfort on Smith's part with physical intimacies initiated or requested by him (Pl. Tab 62/Dkt. No. 46-26 at 2-3). Sandstrom did not supplant, alter, or distort the panel's findings by referring to some of the specific content of Doe's statement to Bossong and its relation to Smith's statements. *See BC I,* 892 F.3d at 91; *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003) (unpublished) (affirming summary judgment for the university and ruling that "[w]ithout any evidence that [an allegedly biased University employee] influenced the voting members to find against [plaintiff] because of his sex, and without any indication that [the allegedly biased employee] affected the proceedings in a significant way, [plaintiff] has not demonstrated that a genuine issue of material fact exists with respect to his assertion of a sex–based erroneous outcome").

Doe has not shown that Camacho's response to Doe's complaint about Smith's contribution to the banner, which occurred after Doe was found responsible for sexual misconduct and did not identify Doe or disclose investigative material, did not comport with the college's confidentiality and retaliation policies or was indicative of gender bias.  Assuming solely for the sake of argument that a reference to the MeToo movement shows concern for women who have been disadvantaged or abused on the basis of gender, a "pro-complainant bias . . . is insufficient to create an inference of anti-male bias." *Doe v. Univ. of Denver,* 952 F.3d 1182, 1197 (10th Cir. 2020).  In addition, Camacho was not a member of the hearing panel, nor did the Process give her the authority to make decisions about the evidence that would be submitted to the hearing panel.  While Sandstrom consulted with Camacho, there is no evidence that Sandstrom ceded her responsibility to make evidentiary decisions to Camacho or anyone else.  Thus, even if Doe had pointed to evidence of gender bias on Camacho's part (which he has not), he has not shown that she was in a position to affect the outcome of the proceeding.  *See BC I,* 892 F.3d at 91.  *Compare Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. 2015) (denying motion to dismiss based on alleged flaws in the proceedings and specific biased statements of a university official, who wielded "considerable influence" over the outcome of the disciplinary process).  Doe's "impression" that Bossong "believed it was important for women in particular to speak out about their experiences" is also insufficient to establish gender bias (Pl. Tab 75/Dkt. No. 46-39 ¶ 8).  *See BC I,* 892 F.3d at 93 (more than "'conclusory allegations, improbable inferences, and unsupported speculation' [are] required to defeat summary judgment" on a Title IX claim) (quoting *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir. 1993)).

"[T]he record contains gender-neutral explanations for the outcome of [the January portion of] Doe's case – mainly that the [hearing panel] concluded that there was enough evidence to support its finding." *BC I,* 892 F.3d at 92.  The panel read all of the evidence, determined which facts were relevant, examined the Code of Conduct, applied the preponderance of the evidence standard, and determined that it was more likely than not that Doe violated the Code of Conduct by engaging in nonconsensual sexual contact with Smith on January 11, 2017 (Def. Tab 5/Dkt. No. 38-7 at 18, 38, 42, 43, 47, 50-53; Def. Tab 6/Dkt. No. 38-8 at 31, 33-35, 39). *See id.* at n.19.  At the end of day, Doe's arguments that the outcome was erroneous because of gender bias are unpersuasive where the record amply supports the hearing panel's decision. Smith was prompt in expressing her discomfort with her experience with Doe in November 2016 and in reporting her encounter with Doe in January 2017, her statements were largely consistent over time, (notwithstanding Doe's claims to the contrary), and her version of events was credible, bolstered as it was by Doe's admissions and witnesses' contemporaneous accounts of her demeanor in the immediate aftermath of her January 2017 interactions with Doe.[13]

       2.      Selective enforcement.

Doe contends that the college administrators failed to offer him "any options" when he sought help with "an ongoing conflict . . . with another student" after, he alleges, Smith threatened that "lots of people [were] ready to hurt [him]" if he did not resign from his leadership position in the campus organization (Dkt. No. 46 at 19-20; Def. Tab 11).  "To succeed on [a selective enforcement] claim, [a plaintiff] must show that 'the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'" *Haidak,* 933 F.3d at 74

---

[13] Doe further recycles claims about alleged flaws in the disciplinary process as a basis for his Title IX claim.  The merits of those claims are addressed above, and, in any event, Doe has not explained how they would demonstrate gender bias in the circumstances of this case.

(quoting *Yusuf,* 35 F.3d at 715).  "Specifically, a plaintiff must show that 'a similarly situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender.'"  *Doe v. Trs. of Dartmouth Coll.,* Civil No. 22-cv-018-LM, 2022 WL 2704275, at *8 (D.N.H. July 12, 2022) (quoting *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1211 (M.D. Fla. 2019); *Haidak,* 933 F.3d at 74).

Contrary to Doe's claim that the college failed to offer him any options when he sought help in January 2017, college administrators referred him to the college's psychological services and the chaplain (Def. Tab 11 at WC004082 to WC004083).  As to the college's alleged failure to recommend that he initiate a disciplinary proceeding against Smith, the "[s]ignificant difference[]" between Doe's complaint of a conflict with Smith and Smith's complaint of sexual misconduct warranted different responses (Def. Tab 11 at WC004083).  *Williams Coll.,* 530 F. Supp. 3d at 114.  Doe did not identify a provision of the Code of Conduct that Smith violated (Def. Tab 11).  In contrast, Smith's formal complaint was based on Doe's alleged violation of the prohibition against sexual misconduct.  *See Haidak,* 933 F.3d at 74 (no selective enforcement where the students "were not similarly situated as complainants.").

Doe has not pointed to evidence that a female student who sought the college's assistance in resolving a conflict with another student was treated differently.  *See Williams Coll.,* 530 F. Supp. 3d at 113-14; *Doe v. Univ. of Mass.-Amherst,* Civil Action No. 14-30143-MGM, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) ("Plaintiff has not alleged any facts indicating male and female students accused of sexual harassment are treated differently by the university in terms of the way complaints are pursued or discipline is imposed.").  *Compare Doe v. Brown Univ.,* 327 F. Supp. 3d 397, 412-13 (D.R.I. 2018) (plaintiff's claim of selective enforcement survived dismissal where the university investigated a female's claim of sexual assault but ignored a

male's similar claim); *Doe v. Amherst Coll.,* 238 F. Supp. 3d 195, 223 (D. Mass. 2017) (the male

plaintiff stated a viable claim of selective enforcement by presenting evidence that the college

encouraged the female student to file a complaint but did encourage him to file where the female

may have initiated sexual activity when the plaintiff was so inebriated as to be unable to

consent.  Where Doe has not pointed to evidence that he was treated differently from a similarly

situated female he cannot show a violation of Title IX based on selective enforcement.

Williams is entitled to summary judgment on Count III.

IV.     CONCLUSION

For the above-stated reasons, Williams College's Motion for Summary Judgment (Dkt.

No. 36) is GRANTED.  The clerk is directed to close the case.

It is so ordered.

Date:  September 7, 2022                               /s/ Katherine A. Robertson
                                                      KATHERINE A. ROBERTSON
                                                      United States Magistrate Judge